JCGQcomO

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

COMMISSIONS IMPORT EXPORT S.A.

                    Plaintiff

          v.                              19 MC 195 (KPF)
                                          Oral Argument

REPUBLIC OF THE CONGO, et al.

                    Defendants

------------------------------x
                                          New York, N.Y.
                                          December 16, 2019
                                          11:00 a.m.

Before:

                    HON. KATHERINE POLK FAILLA

                                          District Judge

                          APPEARANCES

GOULSTON & STORRS PC
     Attorneys for Plaintiff
CHARLES R. JACOB III
ISABEL SUKHOLITSKY


ASHCROFT LAW FIRM LLC
     Attorneys for Defendants
MICHAEL SULLIVAN
KIMBERLY P. WEST

JCGQcomO

```
1              (Case called)
2              DEPUTY CLERK:  Counsel, please state your name for the
3      record beginning with the plaintiff.
4              MR. JACOB:  Your Honor, for petitioner, Commissions
5      Import Export, Charles Jacob from Goulston & Storrs.
6              MS. SUKHOLITSKY:  Isabel Sukholitsky from Goulston &
7      Storrs.
8              THE COURT:  Thank you very much.  Good morning to both
9      of you.  Just one moment, please.
10             Go ahead.  Thank you.
11             MS. WEST:  Good morning, your Honor.
12             Kim West with the Ashcroft Law Firm for respondent
13     Republic of the Congo.
14             MR. SULLIVAN:  Good morning, your Honor.
15             Michael Sullivan on behalf of the Republic of the
16     Congo with the Ashcroft Law Firm as well.
17             THE COURT:  Thank you to both of you.
18             I should ask each table, is there someone to whom I
19     should be directing my questions?  Mr. Jacob?
20             MR. JACOB:  Yes, to me, your Honor.
21             THE COURT:  Thank you.
22             MR. SULLIVAN:  And to me, your Honor.  I may defer at
23     some moment in time to Ms. West.
24             THE COURT:  Thank you.
25             Mr. Jacob, we begin.  This is our first, I believe,
```

JCGQcomO

1   in-person conference in this matter.  I am familiar with the

2   docket of the case, having signed some of the orders.  What I'd

3   really love to know is now that we have folks here representing

4   the defendant, or at least one of the defendants, that you're

5   on the way to getting your judgment satisfied.  So please tell

6   me that we're all done, and it's resolved we can all go home.

7           MR. JACOB:  I wish I could, your Honor, but that's not

8   the case.

9           THE COURT:  Then tell me the truth.  Go ahead.

10          What, if anything, has happened, because one of the

11  things was as we were setting this conference date, there was

12  an appearance by counsel on behalf of one of the defendants and

13  not on behalf of the other.  Is that still the case?

14          MR. JACOB:  Yes, your Honor.  Nothing has really

15  changed except that counsel has appeared.  As you know, the

16  clerk entered certificates of default against both the

17  respondents in August.  We applied for an order to show cause

18  to get default judgments.  Your Honor put that off pending a

19  conference.  Immediately before the conference, counsel

20  appeared and we were moved to today, which is fine because it

21  gave the Republic a chance to do something that, very notably,

22  your Honor, it has not done, which is, it has not moved to

23  vacate the clerk's default against it, nor has Ecree, of

24  course, appeared, and they are not here today.

25          They've had plenty of time to move to vacate that

JCGQcomO

default having counsel now, and they haven't done so.  And we

believe that speaks to the situation we find ourselves in,

which is that there really is not a defense to the allegations

in the petition, and the Republic is essentially stalling for

time as it has, for example, in the district court for the

District of Columbia, where before Judge Leon they are in

contempt of court incurring sanctions of $80,000 per week for

failure to provide discovery of a postjudgment nature.

Your Honor, to vacate the clerk's certificate of

default, the standard is the same as vacating a default

judgment.  Under Rule 55 there is a case law to that effect,

and we believe it's a reasonable inference that they are not

moving to vacate the default because one of the elements --

there are others -- but one of the elements to do so is an

evidentiary showing on the merits of their defense.  And we

don't think they can show that, and we don't think there are

any volunteers in the Republic of the Congo to sign an

affidavit of declaration that what's set forth in the petition

is wrong.

So, what we would request, your Honor -- since

whatever else is true with the Republic, Ecree has defaulted,

and it is the owner of the condominium in question, we request

that we be permitted to proceed to a default judgment, at the

minimum, against Ecree and proceed following that to sale of

the condominium.  And I'm happy to address the procedures under

JCGQcomO

1   the New York CPLR.  Your Honor's order from late August

2   expressed an interest in discussing those.  I'm happy to do

3   that, but I thought I should just give you the overview as to

4   where I think we are first, and if you have any questions, I'm

5   happy to answer them

6           THE COURT:  We'll talk about the CPLR procedures

7   later.  Thank you very much.

8           Mr. Sullivan, is your firm also involved in

9   representing the Republic in the proceedings in the District of

10  Columbia?

11          MR. SULLIVAN:  We are not, your Honor, at this point

12  in time.

13          THE COURT:  Is there an attorney who is representing

14  the Republic in the proceedings in the District of Columbia?

15          MR. SULLIVAN:  Based on my review of the pleadings,

16  I'm not aware there is.

17          THE COURT:  I'll ask you to bring the microphone a bit

18  closer to you, sir.  Thank you.

19          And your agreement with the Republic doesn't extend

20  there.  You are here now.

21          MR. SULLIVAN:  Yes.

22          THE COURT:  Why are you here now?  And I mean that in

23  a very serious way.

24          MR. SULLIVAN:  Sure.  Absolutely, your Honor.

25          We're here after the meeting with the client, and the

JCGQcomO

1    client expressing to us, consistent with the Republic of the

2    Congo's previous positions, that it has no interest in the

3    condo that's the subject of the requested transfer order.

4         So that's first and foremost, your Honor.  We want the

5    Court to be aware of that.  It's been previously publicized

6    that the Republic Congress has no interest in the condo.  We

7    knew that there was this conference today.  We're going to ask

8    the Court to have the default to be removed, and give the Congo

9    an opportunity to file a response to the pleading in the

10   matter.

11        I am confident the Court has read the pleadings in the

12   case.  The basis of the claim is as a result of an article from

13   *Global Witness*, which we would suggest, your Honor, is an

14   advocacy, not a news organization.  And even if you read some

15   of the allegations in the article, it's insufficient to

16   establish that the Republic of the Congo has any interest in

17   the property, your Honor.

18        THE COURT:  I thought there were also reports in the

19   *New York Times*, were there not?

20        MR. SULLIVAN:  There were, your Honor.  If you read

21   the *New York Times* article closely, essentially all it has done

22   is lifted the representations made in the *Global Witness*

23   report, which form the basis to then send letters to members of

24   Congress and to articles.  When I say it formed the basis for

25   *Global Witness* to do those things, consistent to its advocacy

JCGQcomO

1      position.  The funds that are claimed to be the source of the

2      purchase of the condo was as a result of a business transaction

3      between the Republic of the Congo and a Brazilian company, a

4      well-established Brazilian company, a company that's been in

5      the business in Brazil since 1966 that does significant

6      infrastructure and construction projects both in South America

7      as well as in the African continent.

8            The Republic of the Congo indicates that the payment

9      to the Brazilian company was for services rendered.  They did a

10     water project infrastructure within the Republic of the Congo

11     to bring drinking water to a number of villages that were

12     without clean drinking water, and they also did work in

13     constructing, I believe, it's 12 hospitals for the benefit of

14     expanding the reach of medical services in the Republic of the

15     Congo.

16            So, the payment to the company that they're claiming

17     is the source of the funds ultimately being used to purchase

18     the condo was a direct payment to the company called Asperbras,

19     which is a Brazilian company, your Honor.

20            THE COURT:  Just to spell it for the record,

21     A-S-P-E-R-B-R-A-S.

22            MR. SULLIVAN:  That's correct, your Honor.

23            The further claim is that an agent of Asperbras, a

24     gentleman by the name of Mr. Vega, is the person that is the, I

25     guess, legal owner through Ecree of the condo itself.  Ecree

JCGQcomO

1    obviously has not filed any appearance.  Mr. Jacob indicated

2    that he has served Ecree by notifying K&L Gates your Honor.  We

3    reached out to K&L Gates to find out about the initial

4    transaction as it related to the purchase of the condo; spoke

5    to a former partner at K&L Gates who is now with Novartis.  Her

6    name is Marina Solo.  M-A-R-I-N-A-S-O-L-O, I believe is the

7    spelling of her name, your Honor.  She is on some of the

8    documents relating to the creation of Ecree.  Attorney Solo

9    represented to me that K&L Gates is not and has not been the

10   agent for Ecree for over a year and a half.  That was based on

11   a very simple call, your Honor, for the purpose simply to let

12   somehow Ecree know that there was a proceeding in which they,

13   as the lawful, innocent owners of the condominium, may lose the

14   condominium through these proceedings.

15           Prior to speaking to Ms. Solo, I also reached out to

16   Matthew Schiller, a former associate at K&L Gates, who gave me

17   the contact information for Marina Solo.  Marina Solo also

18   represented to me, your Honor, that during the course of the

19   creation of Ecree, in the identification of the sources of

20   funds that were used for the purposes of purchasing the condo,

21   that they did their due diligence at K&L Gates, and there was

22   no evidence that any of the funds were being sourced from the

23   Republic of the Congo.

24           THE COURT:  May I hear that again please, sir?  I want

25   to make sure I understand how she can tell you this consistent

JCGQcomO

```
1    with any professional obligations that she may have to Ecree.

2            MR. SULLIVAN:  She shared it, your Honor, voluntarily.

3    I asked her you know whether or not K&L Gates did any due

4    diligence, and she indicated that it did, and that there was no

5    evidence that any of the funds came from the Republic of Congo.

6    She was aware of the Global Witness report that suggested that

7    the funds were coming from the Republic of the Congo.

8            My client has clearly expressed to me that it has no

9    interest in the condo, your Honor, none

10           THE COURT:  Which is interesting.  Why then -- you'll

11   take this the right way.  Why are you here?  Because it's not

12   as though -- if you have no interest in it, it seems odd that

13   you're fighting so hard for the entity that elected not to show

14   up.

15           Now, your larger point, which I'm considering very

16   seriously, is that they just may not know because the wrong

17   people may have been served and eventually I will talk to

18   Mr. Jacob to speak about that issue, but you want to vacate the

19   certificate of default and to have me do what?  Because I'm not

20   sure.  You concede that the Republic owes a substantial amount

21   of money to the plaintiff in this case, correct?

22           MR. SULLIVAN:  We can, your Honor, yes -- I'm sorry,

23   concede or we can see.

24           THE COURT:  Both.

25           MR. SULLIVAN:  OK.  We certainly can see that it
```

JCGQcomO

1     appears based on an arbitration proceeding outside of the

2     United States that there is an arbitration award against the

3     Republic of Congo.  That arbitration award continues to be

4     defended by the Republic of Congo by French lawyers.  We have

5     no involvement there.  They are looking -- as I understand it,

6     your Honor, the lawyers representing the Republic of the Congo

7     in France continues to look for avenues to have that award set

8     aside.  I'm not standing before the Court representing that

9     they've identified any particular avenues in terms of having

10    the award set aside.  I do know that there is an award, your

11    Honor, against the Republic.

12         THE COURT:  Just to that point.  The award was issued

13    at some point, I suppose -- oh, in or about 2000.  It was in

14    the District of Columbia.  I presume it was domesticated or

15    filed in 2013.  Maybe there is something strange about this

16    award, but usually the time period for challenging isn't six

17    years long.  So, I'm not sure what -- I appreciate that the

18    French people, the French attorneys are looking for ways to get

19    around it, but there's an award today, and it's been filed in

20    the district of the District of Columbia, and I'm not really

21    sure why it's not being paid on just because someone thinks

22    that some day really smart French people will figure out a way

23    out of paying it.  That's fine.  So, why don't you keep talking

24    because I still want to know why you're fighting over the condo

25    that you have no interest in.

JCGQcomO

1          MR. SULLIVAN:  Your Honor, we're not fighting over the

2     condo because we don't have an interest in the condo.  Why are

3     we here?  Certainly for the Court to know that notwithstanding

4     that the Republic of the Congo has been defaulted, the Republic

5     of the Congo has no interest in the condominium.  We think it

6     important for the Court to know that directly from the client.

7          Number two, your Honor, the filings in this case has

8     been very damaging against the Republic of Congo because the

9     filing is exclusively the *Global Witness* report, which we would

10    argue, your Honor, is uncorroborated and has an ulterior motive

11    as it relates to the Republic of the Congo and some of the

12    principals within the government of the Republic of the Congo.

13         So, the client believes it's important that its

14    reputation be defended to the extent that it can through an

15    opportunity to file something within the court, your Honor, as

16    it relates to the representation that the Republic of the Congo

17    was involved in some type of money laundering for the purpose

18    of purchasing this condo.  So, that's critically important from

19    the client's perspective.

20         Also, as its relates to the claim representation that

21    the president's daughter somehow is complicit here as well in

22    terms of possibly being an owner of the condo, I would point

23    out to the Court, I'm not aware there has been any notice at

24    all provided to the daughter of the president.  I get that

25    information, your Honor, in terms of the claimed some type of

JCGQcomO

ownership through the *Global Witness* report.

I'm not saying that the report is factually accurate. In fact, we're disputing the statements in the *Global Witness* report, but certainly if there is any accuracy there that the daughter has some interest in the condo, then I would think that some notice to the daughter would be important as well.

And then the final point, your Honor, again, interest is principally around letting the Court know that the Republic of the Congo has no interest in the condominium, is deciding its options as it relates to Ecree.

The other thing we did, your Honor, because we were concerned that Ecree was not aware of these proceedings, we reached out to Ecree's -- to Mr. Vega's counsel in Portugal, your Honor.  He was on trial and was not able to get back to us in advance of this hearing.  We located him and left a message with him last week, your Honor.

We did have a quick meet-and-confer with Mr. Jacob in advance of coming here.  I asked if there was any evidence beyond the *Global Witness* report that somehow tied the condo into the Republic of the Congo, and he said at that time that there was no other evidence besides the *Global Witness* report. So, that's the reason why we're here, your Honor.

THE COURT:  There is a certificate of default that's been entered with respect to your client.  I don't believe that you've given me a written submission as to why it should be

JCGQcomO

1    vacated.  Are you asking for leave to do so, or was it your

2    intention to make an oral application for its vacatur?

3         MR. SULLIVAN:  I'm asking for leave to file something,

4    your Honor, with the Court.

5         THE COURT:  Because I'm sure you heard Mr. Jacob when

6    this conference began and he was noting the significance that I

7    should deduce from the fact that no application was made.  Did

8    you let him know at any point prior to this conference this

9    morning that it was your client's intention to move to vacate

10   the certificate of default?

11        MR. SULLIVAN:  I don't believe I specifically

12   indicated that, your Honor.  We indicated that we are

13   contesting the Republic of the Congo's interest in the

14   condominium.

15        THE COURT:  And you have passed on to him as well the

16   information that you obtained regarding your efforts to speak

17   with representatives for the other defendant, Ecree?

18        MR. SULLIVAN:  I don't believe I did, your Honor.  I

19   did ask Mr. Jacob whether or not he reached out to anybody at

20   K&L Gates directly beyond the notice of service, and my memory

21   is, your Honor, he said he had not reached out to anybody at

22   K&L Gates.

23        THE COURT:  OK.  One moment, please.

24        (Pause)

25        THE COURT:  Other things you'd like me to know at this

JCGQcomO

1    time, sir?

2              MR. SULLIVAN:  Can I have a moment, your Honor?

3              THE COURT:  Of course.

4              (Pause)

5              MR. SULLIVAN:  Not at this time your Honor.

6              THE COURT:  Thank you.

7              Mr. Jacob, let me hear you in response.

8              MR. JACOB:  Thank you, your Honor.

9              In what I think is the order of importance, Ecree is a

10   New York limited liability company.  Document 6 on the docket

11   of this case, which counsel did not refer to, is the affidavit

12   of service by which Ecree LLC was served through the New York

13   Secretary of State, which is the basic A B C of how you serve a

14   New York limited liability corporation.

15             Our service on K&L Gates, which we attempted in a

16   couple of ways, including having them refuse it, I should note,

17   and that's in the docket too, was done to ensure that the

18   lawyers who were responsible for this transaction, because they

19   are the registered agents of the condominium, were on notice

20   that this was happening.  One would think at a firm like

21   K&L Gates, if we were wrong in what we were alleging, we would

22   have had an immediate telephone call from some aggrieved

23   attorney at K&L Gates explaining to me, Mr. Jacob, this is just

24   a misunderstanding; you've got it all wrong.

25             THE COURT:  Yes, although perhaps that might be

JCGQcomO

1    explained by the fact that the principal attorney is now no

2    longer with the firm and is in-house somewhere.

3           MR. JACOB:  We served them both in New York and in New

4    Jersey.  We're aware of Ms. Solo because she was the name on

5    the condo agent designation, and she was in their office in

6    Newark, your Honor.  But out of abundance of caution and

7    belt-and-suspenders, we attempted to serve K&L Gates in New

8    York as well to make sure we weren't missing something in case

9    no one was in the Newark office who knew about this.  So we

10   served K&L Gates, or tried to, in both offices.

11          In terms of the Republic now applying to vacate the

12   default, today is the first I've heard of that.  I respectfully

13   submit it's too late.  Counsel appeared by letter on October 1,

14   I believe.  One component of moving to vacate a default is your

15   diligence in doing so.  And without invoking cynicism

16   inappropriately, I am concerned that this is a delay tactic,

17   and if they are given a lot of rope to do this, they will just

18   take advantage of it.

19          I respectfully further submit to get at what I think

20   is the crux of this, your Honor, that vacating the Republic's

21   default doesn't stop us from proceeding to sale against Ecree

22   because Ecree is the owner, they are defaulting, or they have

23   defaulted.  No one has appeared.  To suggest that no one knows

24   about this petition, when counsel himself says it's caused some

25   great reputational issue -- and I can come back to that --

JCGQcomO

simply belies the obvious.

The owner of the condominium is not stepping forward to dispute the allegations in the petition.  A country does not have a reputational interest, and even if it did have a reputational interest, a reputational interest is not a property interest under some Supreme Court decisions of some time ago.  So, whatever interest they're defending, it is not going to the heart of this case.  The entity that owns the condominium is not disputing the facts in the petition, and I don't really want to delve deeply into the transactions unless your Honor wants us to, but it's fairly clear that the Brazilian entity of which counsel spoke so many highly was overcharging the Congo for the services and the surplus went through a shell Virgin Islands company and then went to Ecree. And Ecree was incorporated almost immediately before the funds came, and then it bought the co-op for $7 million.

So, there's no explanation from counsel as to how the money that Ecree has is legitimate.  He is simply trying to focus you on the first leg of the transaction and say, well, that's a real company there in Brazil, so this is all OK.  But the further steps are not being explained, and who Ecree is is not being explained.  And the *Global Witness* article and the *New York Times* article, which I don't think is unimportant, because whatever counsel says about *Global Witness*, I do not believe the same descriptors can be applied to the *New York*

JCGQcomO

*Times*, which published this article on the front page of the

business section, and I believe would have vetted it

sufficiently to satisfy the *New York Times* that this is a

legitimate set of facts.

        And in applying to buy the condo, the condo

association was presented with letters of reference for the

daughter, Claudia, and the granddaughter.  That doesn't make

them parties to the case.  The owner is Ecree.  Let's stick to

property interests here.  So, I don't think we needed to serve

the daughter.  And, again, assuming in some, frankly -- well,

let me not characterize it.  According to counsel, this is a

big deal in the Congo somehow vis-a-vis reputation.  Counsel

have been on the case now since the 1st of October.  Someone

could have intervened if they think they have an interest.

Nothing has been done, except apparently conversations with

alleged witnesses that I'm hearing about for the first time

today.

        So, I again request that we be allowed to proceed to

default against Ecree.  Your Honor may let counsel make the

application to vacate as against the Republic.  I submit it's

untimely, but it's a Rule 55 application, your Honor.  They're

not that easy to win under these circumstances where it's been

months, they've known about it, and they have to make a showing

among the merits.  So we will certainly oppose that.  But

whatever you do in that regard, I would just ask it be done on

JCGQcomO

a reasonably timely time frame because we've been waiting to
try and proceed with a sale if we can satisfy the Court that
we've fulfilled the steps and explained to the Court the steps
under the CPLR.  Again, I'll come back to the CPLR if your
Honor wants today.  But with respect to what counsel is saying,
we don't agree at all.  Ecree was properly served.  They're
defaulted.  We should be allowed to proceed against them, and
the Republic is simply stalling for time.

One last item.  This business about somebody in France
running around looking at the arbitration award, that award
pursuant to what's referred as the New York Convention was duly
converted into a judgment.  Actually, there was more than one
award.  There were two judgments in the District of Columbia.
These were not defaults, your Honor.  You will notice, I
believe it's Exhibit 3 of the petition, in the same order that
holds the Republic in contempt, Chadbourne & Parke is relieved
from the case because Republic stopped paying Chadbourne &
Parke.  So through the entry of the judgments in question, a
very capable law firm in the form of Chadbourne & Parke who was
representing the Republic, and asked to be let out because they
weren't getting paid and couldn't continue, and Judge Leon let
them out.  However, since they hadn't provided discovery, he
also held the Republic in contempt, and so you have a
continuing contemnor in your court here today asking you for a
lot of judicial mercy, more than we think they are entitled to.

JCGQcomO

```
1         THE COURT:  Well, wait, wait.  Before you sit down,
2    two points from that.  Number one, are you asking me to
3    consider the conduct in the District of Columbia in
4    ascertaining whether or not to vacate the certificate of
5    default as to the Republic in this case?
6         MR. JACOB:  I'd like to see their papers first, but I
7    think we are entitled to at least point to a pattern of
8    behavior because we're here in proceedings in this court in aid
9    of a proceeding in sibling district court, and what happened in
10   that other court is not necessarily irrelevant here.  So I
11   don't want to commit to what our opposition is going to be, but
12   yes, I certainly think if we can satisfy you that there is a
13   pattern of dilatory behavior by a judgment debtor, your Honor,
14   that's not unheard of in attempts to enforce judgments, and we
15   reserve the right to refer to that, sure.
16        THE COURT:  Also, with respect to the petition itself
17   in the underlying arbitration awards -- there are two -- do I
18   understand correctly -- well, maybe I should understand
19   correctly.  There were arbitration awards.  Do you know when
20   they were issued, the two awards?
21        MR. JACOB:  I believe the early two thousands.  I
22   would need to look at the exact dates.
23        THE COURT:  Would it be wrong for me to suppose that
24   the time to appeal those awards or to seek their vacatur has
25   lapsed?
```

JCGQcomO

1          MR. JACOB:  I haven't specifically researched it, but

2     my understanding would be that it has lapsed.

3          THE COURT:  OK.  The two awards were reduced to

4     judgment in the District of Columbia.  They were entered

5     pursuant to the New York Convention.  Normally when I see that,

6     in this district, at least, it's done by a petition to confirm

7     an arbitration award.  That's usually the time for the other

8     side to petition to vacate if they so care to do.  There was

9     no -- was there a corresponding petition to vacate?

10          MR. JACOB:  You're testing my memory, your Honor, but

11     I believe there was opposition, and there was confirmation of

12     the awards over the opposition.  One thing I can say is that

13     there was no appeal.  One thing I'm certain of is the time to

14     appeal the D.C. judgment that's elapsed.  That's definitely

15     elapsed.

16          THE COURT:  That's what I thought as well.  I'm not

17     sure -- they may be looking for a way out among the French

18     attorneys.  I just don't -- not necessarily in my case, not

19     necessarily in Judge Leon's case.

20          MR. JACOB:  I would respectfully suggest that the

21     business about the French attorneys be disregarded by the

22     Court.

23          THE COURT:  Well, I figured you would, but before I do

24     so, I want to be sure I'm doing that correctly.

25          All right.  Let me return to Mr. Sullivan.  Thank you.

JCGQcomO

1          Mr. Sullivan, if I were to grant you the opportunity

2     to make a written submission regarding vacatur of the

3     certificate of default, what do you think I should do with

4     respect to Ecree who has not appeared?

5          MR. SULLIVAN:  I would ask the Court to ask Mr. Jacob

6     to provide notice to Mr. Vega's counsel in Portugal.

7          THE COURT:  Why?

8          MR. SULLIVAN:  So that they would have actual notice

9     of the proceedings.

10          THE COURT:  Isn't that the point of -- I've done

11     default judgments based on notice to a secretary of state.  I

12     guess what you're telling me is that even though Ecree has

13     allowed the secretary of state to serve as his agent, I should

14     nonetheless determine in this case that it's insufficient?

15     That's the concern I have.  I appreciate what you're saying

16     about folks who either did or did not get notice about this.

17     It does sound like the K&L Gates firm did get notice, even if

18     they refused it.  But my concern is I feel as though I would be

19     setting quite a troubling precedent if I were to find that in a

20     case in which a corporation has given agency to the New York

21     Secretary of State, that that's not enough.  Is that something

22     I should find here?  And, if so, why?

23          MR. SULLIVAN:  I'm not suggesting you should find it's

24     not enough, your Honor.  You asked the question.  I'm not here

25     to defend Ecree.  I want to make that clear, your Honor.

JCGQcomO

```
1              THE COURT:  Of course.  OK.

2              MR. SULLIVAN:  Obviously, if Ecree is an innocent

3   owner of the property, and we argue that the Republic of Congo

4   has no interest in the property, and that the Republic of the

5   Congo funds were improperly diverted for the purpose of

6   purchasing the condo, your Honor, we would also want the Court

7   to know based upon our review, Ecree has been suspended as an

8   LLC for not filing some type of returns.  I'm not sure, your

9   Honor, at what point in time Ecree was suspended.

10             Regarding Attorney Solo, your Honor, I didn't ask

11  Attorney Solo whether or not -- I want to be careful here, your

12  Honor.  I can't recall, your Honor, if I did ask Ms. Solo if

13  she was at the firm at the time K&L Gates was served.  I gave

14  her the dates.  I don't recall her comments, your Honor, as to

15  whether or not she was served.

16             THE COURT:  I'm not worried about Ms. Solo at this

17  time.  She is not -- to the best of my understanding, her

18  current position forecloses her from representing Ecree at this

19  time, so I'm not worried about it.

20             MR. SULLIVAN:  She did represent to me that they

21  stopped serving as Ecree's agent a year and a half ago.

22             THE COURT:  Which is why all I've got today is the New

23  York Secretary of state.

24             MR. SULLIVAN:  Right.  Which suggests that Ecree has

25  been in suspended status.
```

JCGQcomO

1        THE COURT:  And yet, I still have nowhere else to

2   serve them.

3        Sir, if you get your wish, then am I not -- there is a

4   world in which I'm entering a default judgment against Ecree

5   and properties being turned over, and then, what, you're

6   fighting with folks at the front table on the issue of the

7   factual statements regarding your client's involvement or not--

8        MR. SULLIVAN:  Correct.

9        THE COURT:  -- in the source of funds.

10        MR. SULLIVAN:  That's correct, your Honor.  That is

11   really principally for the Court's benefit as it makes its

12   final determination as it relates to the transfer of the

13   property as owned by a third party.

14        THE COURT:  But Mr. Jacob is telling me don't wait; to

15   let the property be turned over while we continue with your

16   client as to the factual basis -- the truth or not, the

17   accuracy or not of the factual statements made in the petition,

18   correct?

19        MS. WEST:  I'm sorry, your Honor.

20        THE COURT:  I'll say that again, and I'll try and be

21   more coherent.

22        I believe what Mr. Jacob would like me to do -- well,

23   first, he'd like me to tell you, no way, you can't file your

24   written submission.  I feel a little disquieted about doing

25   that.  But in the alternative, what he's saying is fine, let

JCGQcomO

1    him file his submission that you should deny, but let the

2    turnover take place with respect to Ecree.  Let there be a

3    default judgment as to Ecree because they have done nothing.

4         I think what you're saying to me, sir, is you want me

5    to keep open the Ecree side of the equation while you fight out

6    the factual niceties of the statements in the petition,

7    correct?

8         MR. SULLIVAN:  Only to the extent of our filings, your

9    Honor, and then you can rely on our filings and make a final

10   determination as it relates to a turnover of the property

11   notwithstanding our filings.

12        THE COURT:  Yes, although that itself seems somewhat

13   strange because what I'm being asked to do is that even though

14   Ecree does not care enough to fight in this court, I am

15   supposed to consider filings you have not made yet in -- you're

16   defending them without having that as your principal purpose.

17        MR. SULLIVAN:  Again, it's not my intent to defend

18   Ecree, your Honor.

19        THE COURT:  I know.  I understand that.

20        MR. SULLIVAN:  But I think it would be -- and I know

21   you indicate that Ecree has notice from the secretary of state

22   notice provisions.  I understand notice from the secretary of

23   case.  I don't know whether not Ecree has noticed the actual

24   Mr. Vega.  And certainly, your Honor, we will communicate with

25   Mr. Vega's attorney in Portugal that these proceedings are

JCGQcomO

1    going forward.  If they have an interest in filings an

2    appearance, they can do that on their own.

3             THE COURT:  Won't they figure it out?

4             MR. SULLIVAN:  Well, your Honor, Mr. Jacob indicated

5    that the issue concerning defamation came about as a result of

6    this litigation in this court.  And I would argue, your Honor,

7    the issue concerning defamation against the Republic of Congo

8    by the *Global Witness* article occurred prior to the filing in

9    this proceeding.  In fact, the Republic of the Congo's response

10   to the *Global Witness* story predated the filing of these

11   proceedings in this court.  I think it was on, I think around

12   April 10, your Honor, that the Republic of Congo responded to

13   the allegations in the *Global Witness* report.  They made it

14   clear in their response that they didn't own or have any

15   beneficial or financial interest in the condo.

16            And I am not disputing, your Honor, that Mr. Jacob

17   served certain representatives of the Republic of Congo's

18   government, but I will tell you, your Honor, when I met with

19   the justice minister after being retained, he was not aware of

20   these proceedings, the justice minister of the Republic of

21   Congo.  At least he represented to me he was not aware of these

22   proceedings.

23            THE COURT:  Was he aware of the underlying judgment,

24   sir?

25            MR. SULLIVAN:  Oh, yes, he's absolutely aware of the

JCGQcomO

underlying judgments.

        THE COURT:  And he's aware that they've been filed in
the District of Columbia?

        MR. SULLIVAN:  Again, your Honor, I don't want to say
something that's not completely accurate.

        THE COURT:  I would prefer you not.

        MR. SULLIVAN:  I don't specifically recall a
discussion around the matter in the District of Columbia, but
he was certainly aware of the arbitration judgment, and I would
think that he would have been aware of the proceedings in the
District of Columbia because they did at some point in time
have counsel representing the Republic of the Congo, but I
don't recall specifically, your Honor, if I spoke to him about
it.

        THE COURT:  I will ask the question a little bit
differently.  Remember, I am a lowly government employee, but
if I had a contempt judgment accruing at $80,000 weekly, I
might notice it.  Now, maybe in the scheme of debts here, it's
small potatoes, but he's not aware that his country has been
found in contempt of court here in the District of Columbia?
That's a strange one for me, but who knows?  I don't want you
to divulge privileged communications.

        Mr. Sullivan, I think I have your arguments, but while
I have you standing, I want to make sure I have your arguments.
If there's anything else you'd like to bring to my attention,

JCGQcomO

1    please tell me.  If you need to consult with your co-counsel,

2    that's fine.  Please do.

3             MR. SULLIVAN:  I think at this point in time, your

4    Honor, we have nothing further.  Thank you.

5             THE COURT:  Thank you so much.

6             Mr. Jacob?

7             MR. JACOB:  Thank you, your Honor.

8             Just two things:  First, the service on the Republic

9    was to the minister of foreign affairs.  It was not on some low

10   functionary.  And that's reflected in document 7 on the docket.

11   And that service was done by the clerk of this court, as it is

12   required to be under the Foreign Sovereign Immunities Act.

13            So, the minister of foreign affairs of the Republic

14   received our petition in a DHL delivery from the clerk of this

15   court, which I would submit is quite a bit of notice to a

16   foreign republic.

17            Second, I would just like to respond briefly and

18   further to your question about whether we would rely on the

19   contempt in opposition to their motion vacate the default, and

20   I would ask your Honor to play out where this is going to go if

21   you vacate the default as against the Republic.  Again, Ecree

22   is over here, and we with like to proceed against them.

23            But if counsel were successful in the belated

24   application to vacate the default, we would have the absolute

25   right to discovery.  Yet, we have an uncured contempt of court

JCGQcomO

1     for failure to provide discovery.  And it would seem to me, at

2     a minimum, to permit proceedings in a reopened case upon a

3     vacated default, which we will oppose, and we don't think you

4     should do that, but since a necessary outcome of your granting

5     such an application would be our entitlement to discovery, we

6     would believe the Republic should be required to cure its

7     default, which is a discovery default in that that exists and

8     it is ongoing in the District of Columbia because that really

9     is a logical connection between vacating the default and the

10    contempt.  We should not have to try to take discovery from

11    someone who is in contempt of court already in providing us

12    discovery.

13          Thank you, your Honor.

14          THE COURT:  But what if it's different here?  What if

15    they actually abide by my orders here?  I don't know what

16    powers I have that Judge Leon does not have, but...

17          MR. JACOB:  Well, I could hope.  That would be great.

18          THE COURT:  Understood.  All right.

19          Counsel, thank you very much.

20          Mr. Sullivan, I'm going to ask you, please, to obtain

21    a transcript of this conference with whatever speed you think

22    is appropriate.  I'm going to consider your application, and I

23    will issue an order, I hope before the end of the year.  I

24    won't make any promises, but I want to think very seriously

25    about what each of you have said here today.

JCGQcomO

1          Is there anything else either of you wishes to bring

2     to my attention in this proceeding?

3          MR. JACOB:  Yes, your Honor.  If you will remember

4     from the order to show cause to papers -- I don't mean to test

5     your memory -- but there are really two purely administrative

6     matters that are open, and we would just ask your leave just to

7     resubmit those to get them taken care of.  One is that one of

8     the judgments is denominated in euros, and under the New York

9     Judiciary law, and quite clear federal case law, the right next

10    step is to convert that into dollars, and we've submitted the

11    backup on that, if you will.

12          The other is the 28 U.S.C. 1610 certification on the

13    other judgment, which is just a finding that a reasonable time

14    has elapsed to start enforcing the judgment.  And Judge Leon

15    has already granted that on one of the judgments, but the

16    action shifted up here before it was time to ask him to do it

17    on the other one.  Again, I'm happy to submit an application on

18    that.  Normally, that's a matter -- usually courts will say,

19    well, is three months enough?  Is four months enough?  Here,

20    it's already several years, and so we would submit that both of

21    these are really just administrative, but we would like your

22    leave just to submit those applications as soon as we're able,

23    within the next couple of weeks.

24          THE COURT:  That's fine.

25          Mr. Sullivan, any objection to that?

JCGQcomO

1          MR. SULLIVAN:  In terms of submitting them, we'd

2     certainly want to see them, your Honor.  We are not here at

3     this point, your Honor, to argue any of those requests, but we

4     don't want to waive any rights that the Republic of Congo might

5     have as to Mr. Jacob's request.

6          THE COURT:  Yes.  The conversion to dollars I can't

7     imagine what you'd be fighting about.  The certification

8     perhaps you might, but I'm not sure it would be a winning

9     fight.

10         Yes, Mr. Jacob.  Within 30 days?

11         MR. JACOB:  Thank you, your Honor.

12         THE COURT:  Thank you.

13         Mr. Sullivan, something else?

14         MR. SULLIVAN:  I just wanted the Court to know, this

15    not an attempt to delay any of the proceedings at all.  As the

16    Court has pointed out, the Republic of Congo could have done

17    nothing at all.  They've retained counsel, went to the expense

18    of retaining counsel.  They could have let the condo be

19    transferred for purpose of satisfying a portion of the

20    arbitration award.  In fact, the Republic of Congo believes it

21    is not their condo, so it would have know financial impact on

22    the Republic of Congo.  They are here because they want to see

23    this matter, at least as it relates to them, pursued and

24    concluded without waiving any of its rights or defenses.

25         THE COURT:  All right.  Thank you all very much.  We

JCGQcomO

1    are adjourned.  Happy holidays.

2              MR. SULLIVAN:  Thank you, your Honor.  You too.

3              MR. JACOB:  Thank you, your Honor.

4              (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25