UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

COMMISSIONS IMPORT EXPORT S.A.,

Petitioner,

-v.-

REPUBLIC OF THE CONGO and ECREE LLC,

Respondents.

19 Misc. 195 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

A luxury condominium unit sits at 1 Central Park West. What sets it apart from the many units that surround it is that this unit is alleged to have been purchased with money embezzled from the Republic of the Congo (the "Republic") by its President so that his daughter could reside here. Commissions Import Export S.A. ("Petitioner"), a judgment creditor of the Republic, alleges that the condominium unit is being held by a sham entity, Ecree LLC ("Ecree," and together with the Republic, "Respondents"), and that the proceeds from the condominium's sale can be used in partial satisfaction of the judgments it holds against the Republic. Now before the Court are Respondents' motions to dismiss a turnover petition brought by Petitioner. For the reasons stated in this Opinion, the Court grants Respondents' motions, but also grants Petitioner leave to amend.

## BACKGROUND[1]

### A.   Factual Background

#### 1.   The Judgments

The Republic has been in debt to Petitioner since 1992, with its liability reflected in two arbitration awards.  (AP ¶ 3).  One of these awards resulted in a judgment of €567,184,160.72 and $855,000 that was entered against the Republic in the United States District Court for the District of Columbia on October 9, 2013.  (*Id.* ¶ 4).  The judgment was subsequently registered in this District on June 18, 2014.  (*Id.* (the "First Judgment")).  On July 17, 2020, this Court amended the First Judgment by converting it into United States dollars; Petitioner is entitled under the First Judgment to $772,562,221.53 as of December 31, 2019, and to $2,324.13 *per diem* thereafter.  (*Id.* ¶ 5).

The second of these awards resulted in a judgment against the Republic for $189,781,887, also filed in the District Court for the District of Columbia, this time on August 26, 2015.  (AP ¶ 7).  Like the First Judgment, this judgment (the "Second Judgment," and together with the First Judgment, the "Judgments") was registered in this District on May 26, 2017.  (*Id.*).  On July 31, 2020, this Court found that a reasonable period of time had passed such that Petitioner could enforce the Second Judgment.  (*Id.* ¶ 8).

---

[1]   This Opinion and Order draws its facts from the Amended Petition (the "AP" (Dkt. #102)) and its attached exhibits, the well-pleaded allegations of which are accepted as true for purposes of this Opinion.  For ease of reference, the Court refers to the Republic's memorandum of law in support if its motion to dismiss as "ROC Br." (Dkt. #106); to Ecree's memorandum of law in support of its motion to dismiss as "Ecree Br." (Dkt. #108); to Petitioner's memorandum of law in opposition as "Pet. Opp." (Dkt. #116); to the Republic's reply as "ROC Reply" (Dkt. #117); to Ecree's reply as "Ecree Reply" (Dkt. #118); to the Republic's supplemental brief as "ROC Supp. Br." (Dkt. #120); and to Petitioner's supplemental brief as "Pet. Supp. Br." (Dkt. #121).

### 2.    The Condo

This turnover proceeding concerns a condominium known as Unit 32G at Trump International Hotel & Tower Condominium, 1 Central Park West, New York, New York (the "Condo").  (*See generally* AP).  Petitioner alleges that the Condo "was purchased with funds of the Republic that were illegally and fraudulently transferred from the Republic by its kleptocratic ruling family for the benefit of Claudia Lemboumba Sassou-Nguesso, the daughter of Denis Sassou-Nguesso, President of the Republic[.]"  (*Id.* ¶ 19; *see also id.*, Ex. 5 (Jesse Drucker, *$7 Million Trump Building Condo Tied to Scandal-Scarred Foreign Leader*, N.Y. TIMES, April 10, 2019 ("The funds for the all-cash purchase appear to have been siphoned from that country's government, according to a report by Global Witness.")); *id.*, Ex. 6 (Mariana Abreu, GLOBAL WITNESS, *Trump's Luxury Condo: a Congolese State Affair* ("Claudia Sassou-Nguesso, daughter of Congo's President, used apparently stolen public funds to purchase [the Condo] in the summer of 2014.")); *id.* ("There are strong grounds to suspect the funds were stolen from the Congolese treasury.")).  From these facts, Petitioner argues that the Condo is the Republic's property.

The Republic allegedly executed these fraudulent transfers through "a series of sham transactions[.]"  (AP ¶ 20).  First, money was moved through Asperbras LLC; then through a subsidiary called Energy & Mining Asp. Inc. to a company called Sebrit Limited, which entity had been incorporated just two days before the transfer and of which Ms. Sassou-Nguesso was the beneficial owner.  (*Id.*).  Finally, following a $20 million payment of the Republic's funds

from Energy & Mining to Sebrit, Sebrit transferred money to Ecree, a newly-formed New York limited liability company; Ecree then used $7.1 million of the funds to purchase the Condo.  (*Id.*).  Petitioner avers that Ecree "has and had no purpose other than to be the sham entity through which [Ms. Sassou-Nguesso] could and did use illegally and fraudulently transferred funds of the Republic to purchase the Condominium."  (*Id.* ¶ 21; *see also id.* ¶ 24 ("It is abundantly clear that Ecree was simply a front for [Ms. Sassou-Nguesso]."); *id.* ¶ 29 ("Ecree is not a legitimate company in any respect.  It is a shell company set up by the President and his bagmen … using money embezzled from the Republic, belonging to the Republic, and against which the Judgments can therefore be enforced.")).

With particular respect to the Republic's use of the Condo, the AP alleges that it "was purchased for the use of and as a United States real estate investment for [Ms. Sassou-Nguesso.]"  (AP ¶ 22).  For example, condominium association documents show that the occupant of the Condo was intended to be Ms. Sassou-Nguesso (*id.* ¶ 23 & Ex. 7), and the fact that the Condo was purchased in an all-cash transaction for $7.1 million — despite Ms. Sassou-Nguesso having personal assets substantially less than that amount — confirms that stolen funds were used for the purchase (*id.* ¶ 26).  Because Ecree confirmed that its business purpose is "owning real estate in New York[,]" the Condo is alleged to be used as "an investment in luxury real estate in Manhattan of a sort any private citizen might make[.]"  (*Id.* ¶ 27).

Petitioner alleges that United States Department of Justice proceedings in the United States District Court for the Southern District of Florida corroborate the AP's claims.  (AP, Ex. 8 (DOJ Complaint)).  The complaint in that civil action, for forfeiture *in rem*, alleges that funds embezzled from the Congolese state-owned oil company by Denis-Christel Sassou Nguesso, a minister of parliament in Congo and the President's son, were laundered through various shell entities to purchase a condominium in Miami.  (DOJ Complaint ¶¶ 12, 17-19).  Because these actions constitute a criminal offense under Congolese law (*id.* ¶¶ 79-81), the Department of Justice alleged that the condominium was subject to forfeiture pursuant to various federal laws (*id.* ¶¶ 82-84).  Of potential note, the DOJ complaint is not an action against the Republic or Ecree, nor is it an ancillary proceeding on the Judgments.  (*See generally* DOJ Complaint).

## B.    Procedural Background

Petitioner initiated this action by filing a motion for turnover of property on April 15, 2019.  (Dkt. #1-2).  On August 26, 2019, after serving Respondents, Petitioner obtained two certificates of default against Respondents.  (Dkt. #11-12).  Following the issuance of these certificates, the Court set a hearing for October 9, 2019, noting that it was "not yet prepared to order that the property in question be turned over to [Petitioner]."  (Dkt. #13).  Thereafter, Petitioner submitted further papers in support of a default judgment (Dkt. #14-21); still, the Court noted that it was not prepared to move

forward with a default, and kept the October 9, 2019 conference date (Dkt. #22).

Between September 25, 2019, and October 1, 2019, two attorneys appeared on behalf of the Republic. (Dkt. #24-26). Those attorneys requested an adjournment of the October conference to "determine [the Republic's] position on the matter." (Dkt. #27). Petitioner opposed the request (Dkt. #28), but the Court found it appropriate to adjourn the conference to December 16, 2019 (Dkt. #30). Following the conference, the Court set a schedule for the Republic's anticipated motion to vacate the certificate of default issued against it. (Dkt. #33).

On January 3, 2020, the Republic submitted its motion to vacate the certificate of default and to summarily dismiss the turnover petition, as well as supporting papers. (Dkt. #34-35). On January 14, 2020, Petitioner filed a motion to amend the 2013 judgment, to convert it from euros to dollars, and to find that a reasonable amount of time had elapsed following the judgment, such that attachment and execution were appropriate. (Dkt. #38-42). Three days later, Petitioner submitted its opposition to the Republic's motion to vacate and dismiss, as well as supporting papers. (Dkt. #43-44). On January 24, 2020, the Republic submitted its reply in support of its motion. (Dkt. #46). That same day, counsel for Ecree appeared for the first time (Dkt. #45), and immediately requested that the Court set a briefing schedule for a contemplated motion to vacate the certificate of default issued against it (Dkt. #47). Petitioner filed a letter in response to Ecree's letter, raising suspicions

6

about the timing of Ecree's appearance coinciding with a foreclosure action on the subject property.  (Dkt. #48).

On January 28, 2020, the Court ordered Petitioner to show cause why its motion to amend the judgment and to find that a reasonable period of time had elapsed should not be filed in the District Court for the District of Columbia, which court had entered the 2013 and 2015 judgments.  (Dkt. #49 (Order to Show Cause)).  Petitioner and the Republic then responded to the Court's Order to Show Cause.  (Dkt. #52, 54-55).  Separately, the Court set a briefing schedule for Ecree's motion to vacate the certificate of default (Dkt. #53), which motion Ecree filed on February 21, 2020 (Dkt. #56-59).  Over the following two weeks, Ecree and Petitioner completed briefing on the motion.  (Dkt. #60-63).

Following briefing on the motion to vacate, the Court issued an Order on May 11, 2020, indicating that it was inclined to vacate the certificate of default, but that "in light of the prejudice that Petitioner would suffer from the vacatur … it is appropriate to impose as a condition of the vacatur that Respondents reimburse Petitioner its reasonable attorneys' fees and costs incurred as a result of the default."  (Dkt. #65).  In that same Order, the Court set a briefing schedule for a motion for attorneys' fees related to the defaults.  (*Id.*).  Over the ensuing month, the parties briefed the motion for fees.  (Dkt. #66-70).

On June 18, 2020, Petitioner filed a pre-motion letter seeking reconsideration of the Court's May 11, 2020 Order pursuant to Federal Rule of Civil Procedure 60.  (Dkt. #71).  Both Respondents opposed the letter motion

on the grounds that reconsideration was substantively and procedurally improper.  (Dkt. #72-73).  On June 26, 2020, the Court denied Petitioner's request, noting that Rule 60 was inapplicable and that the time for reconsideration under any other rule had passed.  (Dkt. #74).

Just days later, on June 30, 2020, Petitioner filed a motion for a preliminary injunction to enjoin Respondents from transferring or otherwise disposing of the proceeds of any sale of the subject property.  (Dkt. #75-77). The Court then ordered Respondents to respond to the motion by July 15, 2020.  (Dkt. #78).[2]  On July 8, 2020, Ecree submitted its opposition to the motion for a preliminary injunction (Dkt. #85), and the Republic followed suit on July 16, 2020 (Dkt. #88).  Based on Ecree's representations in its brief that it would not sell the subject property during the pendency of this litigation, and that if it were to accept an unsolicited offer it would place the proceeds from a sale in escrow within the United States, the Court denied Petitioner's motion. (Dkt. #89).

On July 31, 2020, the Court granted Petitioner's motion seeking an order that a "reasonable period of time" had elapsed following the 2015 judgment such that attachment or execution pursuant to 28 U.S.C. § 1610(c) was appropriate.  (Dkt. #90).  Thereafter, on October 27, 2021, the Court awarded $31,687 in attorneys' fees to Petitioner.  (Dkt. #93).  The Court noted in its Opinion and Order that if either or both Respondents reimbursed Petitioner for

---

[2]     Petitioner subsequently withdrew the motion, then refiled a renewed motion the next day.  (Dkt. #79-83).  The Court then allowed Respondents to submit responses by July 16, 2020.  (Dkt. #84).

these fees within 60 days, the Court would vacate the defaults. (*Id.*). In line with this directive, the parties submitted a joint letter on December 27, 2021, noting in relevant part that Respondents had reimbursed Petitioner's costs. (Dkt. #94). The Court endorsed the parties' letter, ordered the parties to submit pre-motion letters regarding Respondents' anticipated motions to dismiss, and vacated the certificates of default entered against Respondents. (Dkt. #95). The parties then submitted dueling pre-motion letters between January 10, 2022, and January 17, 2022. (Dkt. #96-98). Based on these submissions, the Court set a conference for February 16, 2022. (Dkt. #99; *see also* February 16, 2022 Minute Entry).

Following this conference, the Court ordered Petitioner to file an amended turnover petition by March 4, 2022, and set a briefing schedule for Respondents' contemplated motions to dismiss. (Dkt. #101). In this Order, the Court also denied Respondents' request to stay discovery during the pendency of motion practice. (*Id.*). Petitioner filed the AP on March 4, 2022. (Dkt. #102). In line with the Court's Order, Respondents submitted their motions to dismiss and supporting papers on April 4, 2022. (Dkt. #105-109). Petitioner then filed a letter motion to compel post-judgment discovery on May 4, 2022 (Dkt. #112), and the Republic filed an opposition on May 9, 2022 (Dkt. #113). Because Petitioner's requested discovery went "to the merits of the dispute" and the Republic raised questions of "subject matter jurisdiction under the Foreign Sovereign Immunities Act" in its motion to dismiss, the Court stayed discovery

as to the Republic.  (Dkt. #114).  The parties then completed briefing on the motions to dismiss.  (Dkt. #115-118).

On January 20, 2023, the Court requested supplemental briefing from the parties on two issues: (i) "[w]hether the alleged actions in the [AP] related to embezzlement of funds and use of the Condo may be attributed to Respondent Republic of the Congo"; and (ii) "[w]hether Petitioner's first claim for relief under the Declaratory Judgment Act … requires that the Court find … that Petitioner has adequately alleged that Respondent Republic of the Congo fraudulently conveyed assets."  (Dkt. #119).  On February 24, 2023, the Republic submitted its supplemental response (Dkt. #120), and on March 24, 2023, Petitioner followed suit (Dkt. #121).  The Court subsequently denied the Republic's request to file a supplemental reply brief.  (Dkt. #123).

## DISCUSSION

### A.  Motions to Dismiss Under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6)

"Pursuant to Rule 12(b)(1), dismissal for lack of subject matter jurisdiction is appropriate if the Court determines that it lacks the constitutional or statutory power to adjudicate the case."  *Lleshi* v. *Kerry*, 127 F. Supp. 3d 196, 199 (S.D.N.Y. 2015); *see also Makarova* v. *United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that jurisdiction exists."  *Giammatteo* v. *Newton*, 452 F. App'x 24, 27 (2d Cir. 2011) (summary order) (citing *Makarova*, 201 F.3d at 113).  In resolving a motion to dismiss for lack of subject matter jurisdiction, "the court must take all facts alleged in the

complaint as true and draw all reasonable inferences in favor of plaintiff," *Nat. Res. Def. Council* v. *Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (internal quotation omitted), but "jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it," *Shipping Fin. Servs. Corp.* v. *Drakos*, 140 F.3d 129, 131 (2d Cir. 1998); *accord Amidax Trading Group* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011); *APWU* v. *Potter*, 343 F.3d 619, 623 (2d Cir. 2003). On such a motion, a court may consider evidence outside the pleadings, such as affidavits and exhibits. *See Makarova*, 201 F.3d at 113.

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [a] [p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). While the plausibility requirement "is not akin to a 'probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability,

it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

## B.   The Court Grants Respondents' Motions to Dismiss the AP

### 1.   Applicable Law

"[T]he doctrine of ancillary jurisdiction ... recognizes federal courts' jurisdiction over some matters (otherwise beyond their competence) that are incidental to other matters properly before them." *Kokkonen* v. *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994).  "[A] federal court may exercise ancillary jurisdiction '[i] to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent and [ii] to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees.'" *Epperson* v. *Ent. Express, Inc.*, 242 F.3d 100, 104-05 (2d Cir. 2001) (quoting *Peacock* v. *Thomas*, 516 U.S. 349, 354 (1996) (internal quotation marks omitted)).  Where a judgment creditor seeks to void an allegedly fraudulent conveyance from a judgment debtor to a non-party in order to ensure the collectability of an existing judgment, such proceedings fall within the scope of the ancillary enforcement jurisdiction of the district court.  *Id.* at 106-07; *see also RCA Corp.* v. *Tucker*, 696 F. Supp. 845, 850 (E.D.N.Y. 1988) ("[T]he authorities are unanimous that a federal court maintains ancillary jurisdiction to enforce its own judgments, and that, under Rule 69 ... no independent jurisdictional basis is necessary to commence an enforcement proceeding against a garnishee not a party to the original suit."). And as relevant here, the Second Circuit has held that a foreign

instrumentality's waiver of sovereign immunity "continues through post-judgment discovery and collection of the money judgment"; accordingly, "where subject matter jurisdiction under the [Foreign Sovereign Immunities Act (the 'FSIA')] exists to decide a case, jurisdiction continues long enough to allow proceedings in aid of any money judgment that is rendered in the case." *First City, Texas Houston, N.A.* v. *Rafidain Bank*, 281 F.3d 48, 52, 53-54 (2d Cir. 2002), *cert. denied*, 537 U.S. 813 (2002).

### 2.   The AP Alleges a Theory Within This Court's Ancillary Jurisdiction

The parties appear to agree that the Court's jurisdiction over this action depends on whether it can exercise ancillary jurisdiction.[3]  The Supreme Court has instructed that ancillary jurisdiction may be exercised "to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees."  *Kokkonen*, 511 U.S. at 380.  While "[t]he boundaries of ancillary jurisdiction are not easily defined and the cases

---

[3]   To the extent Petitioner argues that 28 U.S.C. § 1330 provides a way around the contested subject matter jurisdiction issues (*see, e.g.*, Pet. Supp. Br. 10), Petitioner is incorrect.  Section 1330(a) notes that

> district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a).  But the Republic is presumably immune from jurisdiction under the FSIA, and thus Petitioner must appeal to an *exception* to such immunity.  (*See* AP ¶ 15(c) ("The Republic is not entitled to sovereign immunity under 28 U.S.C. § 1605 … because … this case falls under the exception from immunity brought to enforce arbitration awards[.]")).  Petitioner has not suggested that any other exceptions to the FSIA apply; in other words, Petitioner must fit this case within this Court's jurisdiction as *ancillary* to the Judgments.  *See, e.g., Multibank, Inc.* v. *Access Glob. Cap. LLC*, No. 17 Civ. 3467 (KPF), 2017 WL 6028535, at *8 (S.D.N.Y. Dec. 4, 2017) ("Like its sister courts, this Court finds that a turnover proceeding … is ancillary to the underlying litigation.").

addressing it are hardly a model of clarity ... [a]t its heart, ancillary jurisdiction is aimed at enabling a court to administer 'justice within the scope of its jurisdiction.'" *Garcia* v. *Teitler*, 443 F.3d 202, 208 (2d Cir. 2006) (quoting *Morrow* v. *District of Columbia*, 417 F.2d 728, 737 (D.C. Cir. 1969)).

The Second Circuit has held that an action to collect a judgment does not require an independent jurisdictional basis even where parties are non-diverse. *See Epperson*, 242 F.3d at 104. As *Epperson* explains, a fraudulent conveyance claim is a quintessential example of a follow-on action to collect a judgment that does not require an independent jurisdictional basis, inasmuch as failing to allow ancillary jurisdiction over such actions "would encourage judgment debtors to engage in such conduct, not only to avoid payment of the judgment but also to force the winning plaintiff to pursue him to another jurisdiction." *Id.* at 107 n.10. Since *Epperson*, courts within the Second Circuit have routinely found that ancillary jurisdiction exists where the plaintiff or petitioner adequately pleads that the judgment debtor's assets have been fraudulently conveyed in order to avoid payment of the subject judgment. *See, e.g.*, *Nat'l Council on Comp. Ins., Inc.* v. *Caro & Graifman, P.C.*, 259 F. Supp. 2d 172, 177 (D. Conn. 2003) (finding, in context of plaintiffs' action seeking declaration that granting of mortgage was fraudulent and designed to avoid restitution order, that "action is within the ancillary jurisdiction of [the] court" and declining to dismiss due to non-diverse parties).

On the other hand, the Supreme Court's decision in *Peacock* v. *Thomas*, 516 U.S. 349 (1996), explains that ancillary jurisdiction does not "extend[ ]

14

beyond attempts to execute, or to guarantee eventual executability of, a federal judgment." *Id.* at 357. As such, a federal court does not have ancillary jurisdiction over a "new theor[y] of liability," such as a veil-piercing claim that seeks to hold a third party independently liable for a judgment. *Id.* at 358-59. Following this instruction, the Second Circuit and courts within it have "draw[n] a distinction between post-judgment proceedings to collect an existing judgment and proceedings, such as claims of alter ego liability and veil-piercing, that raise an independent controversy with a new party in an effort to shift liability." *Epperson*, 242 F.3d at 106; *see also Labarbera* v. *United Crane & Rigging Servs., Inc.*, No. 08 Civ. 3274 (DLI) (ALC), 2011 WL 1303146, at *11 (E.D.N.Y. Mar. 2, 2011) ("By grouping alter ego and veil piercing claims together, it appears that the Second Circuit agrees that courts do not have jurisdiction over alter ego claims seeking to shift liability."); *Knox* v. *Orascom Telecom Holding S.A.E.*, 477 F. Supp. 2d 642, 647 (S.D.N.Y. 2007) ("[O]nce the [c]ourt is required to engage in a veil-piercing or alter ego analysis ... an independent basis for jurisdiction is required.").

Thus, the relevant question for ancillary jurisdiction is not whether the assets are currently in the hands of a third party, but whether the action and its theory are of the type for which ancillary jurisdiction is sanctioned by *Peacock* and *Epperson*. *See, e.g.*, *Epperson*, 242 F.3d at 106 ("Where the post-judgment proceeding is an effort to collect a federal court judgment, the courts have permitted judgment creditors to pursue, under the ancillary enforcement jurisdiction of the court, the assets of the judgment debtor even though the

15

assets are found in the hands of a third party.").  Fraudulent transfers by a defendant designed to evade the court's jurisdiction and judgment are clearly an appropriate use of ancillary jurisdiction, whereas veil-piercing and alter ego claims are new theories of liability that require a separate jurisdictional hook. *See, e.g.*, *Knox*, 477 F. Supp. 2d at 647.

Focusing on the disputed transfers from the President or Ms. Sassou-Nguesso to Ecree through a series of corporations, the parties disagree as to whether this theory is better characterized as a case of fraudulent transfer or as veil-piercing and alter ego liability.  Although the AP includes language sounding in veil-piercing or alter-ego liability against Ecree (*see, e.g.*, AP ¶¶ 21, 24, 27, 29, 36 (all essentially alleging that Ecree is a sham entity totally controlled by the President and Ms. Sassou-Nguesso)), the Court concludes that Petitioner has sufficiently pleaded that this case's core theory is one of fraudulent conveyance — which may fall within this Court's ancillary jurisdiction — and that Petitioner does not seek to, for instance, pierce Ecree's corporate veil.

The Court reaches that conclusion in part because, despite the allegations that Ecree is a sham entity, the relevant relief does not require holding Ecree — a third party to the Judgments — liable.  (AP ¶¶ 31-39). Despite Ecree's protestations to the contrary (*see, e.g.*, Ecree Br. 11-12; *see also* ROC Br. 14 ("[E]nforcement jurisdiction is lacking because Petitioner is attempting … to prove a substantive theory that necessarily requires establishing veil-piercing or alter ego liability on the part of multiple third

parties … to satisfy a judgment against the Republic.")), Petitioner is *not* seeking to deem Ecree an alter ego of the Republic, such that any property it holds *de facto* belongs to the Republic and may be used to satisfy the Judgments (Pet. Br. 10-11). Rather, Petitioner claims that these funds were fraudulently transferred through numerous entities on their way to Ecree, where they were used to purchase the Condo. (*Id.* at 12). The theory is thus not that Ecree is the Republic's alter ego; rather, it is that Ecree was the recipient of fraudulently conveyed funds (now in the form of property) that belong to the Congo. What is more, Petitioner has expressly disclaimed any jurisdictional theory based on Ecree being the Republic's alter ego, despite arguably inartful language in the AP. (*Id.*).

Respondents raise a number of points in support of their argument that this type of claim falls outside of the Court's ancillary jurisdiction, but they are all without merit. That new parties not otherwise involved in the underlying Judgments are involved does not divest this Court of ancillary jurisdiction. Nor is there merit to Respondents' collective grievance that "the supplemental proceeding would require the [C]ourt to engage in fact-intensive discovery to determine whether a conveyance was in fact fraudulent." (Ecree Br. 11; *see also* ROC Br. 12). Indeed, because fraudulent conveyances fall within a court's ancillary jurisdiction, they almost *always* involve a third party that is not otherwise liable and require further adjudication related to the conveyances themselves. *See, e.g.*, *Kim* v. *Yoo*, No. 15 Civ. 3110 (RWS), 2016 WL 258642, at *4 (S.D.N.Y. Jan. 20, 2016) ("Put another way, the fraudulent conveyance

action is not an attempt to recover assets from [defendant's immediate family] to satisfy the underlying judgment (to which they are, of course, not subject); it is an attempt to recover [defendant's] assets to satisfy the judgment against him, even though those assets have allegedly been hidden away under the care of others."), *aff'd sub nom. Tae H. Kim* v. *Ji Sung Yoo*, 776 F. App'x 16 (2d Cir. 2019) (summary order); *see also UFCW Loc. 174 Com. Health Care Fund* v. *Homestead Meadows Foods Corp.*, 425 F. Supp. 2d 392, 394 (S.D.N.Y. 2005) ("The plaintiffs seek through their assertions of fraudulent conveyance to collect the judgment entered against [the debtor] by tracing [its] assets into the hands of related third parties.  The complaint seeks to enforce a judgment rather than to raise an independent controversy with a new party." (internal citation and quotation marks omitted)); *cf. Rosario* v. *251 E. 123rd St. Realty, LLC*, No. 20 Civ. 7387 (JSR), 2021 WL 2169020, at *1 n.3 (S.D.N.Y. May 27, 2021) (discussing the interplay between fraudulent conveyances and ancillary jurisdiction).  As in these cases, Petitioner is not seeking to hold Ecree liable for the Judgments — it is seeking to recover funds (and now property) wrongly in Ecree's hands and to which Ecree is not otherwise entitled.[4]

---

[4]    Ecree's related argument that Petitioner failed to join necessary and indispensable parties to this proceeding, including the other alleged transferor and transferee entities, similarly fails.  (Ecree Br. 15).  Unsurprisingly, Ecree cites no authority for its contention that other parties must be joined, because the argument is contrary to law. *See, e.g.*, *In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 744 (Bankr. S.D.N.Y. 2008) ("[A]n earlier transferee who has parted with all interest in the transferred property is not necessary in a suit against a subsequent transferee[.]"); *see also Lyman Commerce Solutions, Inc.* v. *Lung*, No. 12 Civ. 4398 (TPG), 2013 WL 4734898, at *8 (S.D.N.Y. Aug. 30, 2013) ("[T]he only necessary parties to a fraudulent conveyance action are the transferee and any other party who may claim an interest in the property[.]"); *United States* v. *Mazzeo*, No. 98 Civ. 3060 (JS), 2001 WL 393671, at *5 (E.D.N.Y. Jan. 10, 2001) (same).  Ecree has hardly proven that, for example, Sebrit is a necessary party to this action by arguing "there is an outstanding $12.9 million that Sebrit likely has an

More to the point, this proceeding is entirely distinguishable from the *Orascom* cases in this District on which Respondents principally rely. *See Knox* v. *Orascom Telecom Holding S.A.E.*, 477 F. Supp. 2d 642 (S.D.N.Y. 2007); *Est. of Ungar* v. *Orascom Telecom Holding S.A.E.*, 578 F. Supp. 2d 536 (S.D.N.Y. 2008). In *Ungar*, the plaintiffs obtained a judgment against the Palestinian Authority (the "PA") and the Palestine Liberation Organization (the "PLO") for damages related to a machinegun attack on U.S. citizens orchestrated by Hamas. *Ungar*, 578 F. Supp. 2d at 538. Plaintiffs then sought to collect on that judgment in a turnover proceeding against Orascom, an Egyptian telecommunications company, arguing the following theory:

- The PA previously used the Palestinian Commercial Services Corporation (the "PCSC") as an investment vehicle.

- The Palestine Investment Fund (the "PIF") then superseded the PCSC.

- A decree by the PA mandated that the PA conduct all commercial activity through and transfer all commercial assets to the PIF, including assets previously held by the PCSC.

- The PCSC held ownership stakes in Orascom subsidiaries, which stakes were then transferred to the PIF; thereafter, Orascom and the PIF settled a dispute related to a share purchase agreement, whereby Orascom agreed to pay the PIF $45 million.

- Because PCSC investments, including the Orascom investment transferred to the PIF, were originally made using PA funds, the debt owed by Orascom to the PIF

---

interest in and that would be affected by the outcome of this action." (Ecree Reply 8 n.2). Funds beyond those associated with the Condo are not the subject of this proceeding.

was in fact an asset of the PA upon which Plaintiffs could seek to collect.

*Id.* at 543-44.  The *Ungar* court disagreed, and found that it lacked ancillary jurisdiction over the case because the monies in question were owed to the PIF, not the PA.  *Id.* at 547-48.  The plaintiffs had argued that the assets were only "nominally titled to" the PIF, and in fact belonged to the PA.  *Id.* at 548.  Under their theory, however, the court would have "to make a determination about the relationship between the PA and the PIF — a determination that, for purposes of assessing ancillary enforcement jurisdiction under relevant precedent, is not unlike an alter-ego determination" precluded by *Peacock*.  *Id.*; *see also id.* ("Although [p]laintiffs attempt to craft their pleadings around [*Knox* v. *Orascom Telecom Holding S.A.E.*, which involved effectively the same controversy] by disclaiming, in a conclusory fashion, any allegations of veil piercing, alter ego or third-party liability, those empty statements do not satisfy [p]laintiffs' burden of establishing that this court has subject matter jurisdiction.  In order to grant [p]laintiffs the relief that they seek, this Court would necessarily be disregarding the PIF's corporate form if it ordered Orascom to turn over assets it owes to the PIF, in order to satisfy [p]laintiffs' judgment against the PA.").

Here, there is no such need to make an antecedent finding against Ecree and its status vis-à-vis the Republic in order for Petitioner to seek relief under its theory and its arguments.  Instead, though Petitioner argues that Ecree is a sham entity, Petitioner's main fraudulent conveyance theory is premised on the Republic fraudulently conveying funds — funds that were otherwise subject to

execution — to Ecree, and then Ecree transforming those funds into a different asset titled to itself.  To the extent that Petitioner is merely seeking to void fraudulent transfers, it is not seeking to impose liability on Ecree or put at issue its corporate form.  Rather, it is seeking to divest Ecree of secreted assets that belong to the Republic.

### 3. The AP Fails to Allege That the Relevant Conveyances Are Attributable to the Republic

As a second line of attack, Respondents argue that Petitioner has failed to allege that the fraudulent conveyance was *from the Republic* to Ecree (or to any other owner of the Condo).  All parties to this action have briefed this so-called "attribution" issue under the heading of this Court's subject matter jurisdiction.  (*See, e.g.*, ROC Br. 13; Pet. Br. 10).  This is not an action against President Denis Sassou-Nguesso.  Nor is it one against Ms. Sassou-Nguesso.  It is an action against the Republic itself, as the caption in this case makes clear.  Thus, to the extent that Petitioner has failed to allege that various non-parties' actions are attributable to the Republic, Petitioner's theory that this is an ancillary proceeding also fails.

As noted, Petitioner "bears the burden of establishing that the Court has subject matter jurisdiction to adjudicate the allegations in the complaint." *Knox*, 477 F. Supp. 2d at 644.  In assessing a motion to dismiss for lack of subject-matter jurisdiction, a court must be careful not to "draw[] inferences from the pleadings and other submissions favorable to the party asserting it." *Id.*  Similarly, "the court is not required to credit 'mere conclusory statements' or 'threadbare recitals of the elements of a cause of action.'" *1964 Realty LLC* v.

*Consulate of the State of Qatar-New York*, No. 14 Civ. 6429 (ER), 2015 WL 5197327, at *4 (S.D.N.Y. Sept. 4, 2015) (quoting *Iqbal*, 556 U.S. at 678).  And when jurisdictional questions turn on whether the relevant conduct is attributable to a foreign state, it is proper for a court to consider that question at the motion to dismiss stage.  *See, e.g.*, *id.* at *13 (assessing whether the Qatari Consul General had actual authority such that he was acting as an agent of Qatar and thus actions could be attributed to the sovereign for subject matter jurisdiction analysis under Rule 12(b)(1)).

To establish ancillary jurisdiction under *Epperson*, Petitioner must sufficiently allege facts showing that the Republic fraudulently conveyed (or otherwise transferred) the funds to escape the Judgments.  On this point, the Republic argues that it — the judgment debtor — is in no way implicated in this case, because the AP alleges that the President himself (or the "ruling family") conveyed the funds.  (*See* ROC Br. 13 ("The Amended Petition does not allege that the judgment debtor, the Republic, fraudulently conveyed or transferred its assets.  Instead, Petitioner's allegations and legal and factual theory is that the Republic's funds were misappropriated and subsequently laundered by a third party through the purchase of the Condominium[.]")).

The principal allegations in the AP — while not completely clear — are that the President (described as a member of the "kleptocratic ruling family") — embezzled funds from the Republic and then fraudulently transferred the funds through a series of sham corporations.  (AP ¶ 19; *see also, e.g.*, *id.* ¶ 21 ("Ecree ... has and had no purpose other than to be the sham entity through

which [Ms. Sassou-Nguesso] could and did use illegally and fraudulently transferred funds of the Republic to purchase the Condominium.")).  Later in the AP, however, Petitioner alleges that "the Republic fraudulently transferred the funds[.]"  (AP ¶ 20; *see also, e.g., id.* ¶ 30 ("Because illegally and fraudulently transferred funds of the Republic were used to purchase the Condominium, as a matter of both fact and law the Condominium is property of the Republic[.]")).  In its supplemental brief, Petitioner appears to pivot — perhaps recognizing issues with the sufficiency of its pleading — and relies heavily on the *Global Witness* Article submitted as an exhibit to the AP.  (*See* Pet. Supp. Br. 3 (citing the *Global Witness* Article to argue that "[t]he AP specifically sets forth the series of transactions through which the Republic transferred funds")).[5]

---

[5]     Not only does the AP contain internal contradictions, but it also at times contradicts the *Global Witness* Article on which Petitioner now relies so heavily.  (*See* Pet. Supp. Br. 3 (citing the *Global Witness* Article as stating "[t]he funds were sent by the Congolese Ministry of Finance and Budget responsible for managing the treasury")).  The fact that the AP contradicts itself at times, and contradicts exhibits at others, has only complicated the attribution issue.  The instant petition is a serious proceeding implicating a foreign sovereign and members of its government.  It is well-accepted that a court "need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."  *Brown* v. *City Univ. of New York*, No. 21 Civ. 854 (PKC) (MMH), 2022 WL 4637818, at *5 (E.D.N.Y. Sept. 30, 2022) (quoting *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001)); *see also, e.g.*, *B.B.* v. *The New Sch.*, No. 17 Civ. 8347 (AT), 2018 WL 2316342, at *6 (S.D.N.Y. Apr. 30, 2018) ("Although the [c]ourt should draw reasonable inferences in favor of [p]laintiff, it 'is not obliged to reconcile plaintiff's own pleadings that are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.'" (quoting *Nationwide Mut. Ins. Co.* v. *Morning Sun Bus Co.*, No. 10 Civ. 1777 (ADS) (AKT), 2011 WL 381612, at *6 (E.D.N.Y. Feb. 2, 2011))).  Indeed, in its supplemental brief on the attribution issue, Petitioner all but abandons the actual text of the AP, and instead relies on abstractions of its allegations.  (*See, e.g.*, Pet. Supp. Br. 3-5).

Of course, a foreign state must act through members of its government in much the same manner that a corporate entity must act through its officers. From this premise, Petitioner argues that even though the funds may have been transferred by the President, "[i]t is well-documented that the Republic is a kleptocracy and that the President is in control of all state funds," and thus, the President's actions are attributable to the Republic.  (Pet. Opp. 10-11; *see also id.* at 10 (arguing that there is no "merit to the Republic's argument that the President's misappropriation of Republic funds to benefit his children somehow permits the Republic to escape judgment enforcement here")).  The Court disagrees.  Simply because the Republic is alleged to be a "kleptocracy" does not mean that *all* actions by the President can be attributed to the Republic.  Instead, Petitioner must sufficiently allege that the President's or ruling family's specific transfers of funds (or "embezzlement," as the AP often alleges) can be attributed to the Republic.  *See Epperson*, 242 F.3d at 107 n.10 ("[N]o court should be powerless to enforce its own judgment *when a defendant fraudulently conveys* assets to avoid that judgment." (emphasis added)).

The Second Circuit addressed the question of when an individual government official's conduct may be attributed to the sovereign in *Republic of Iraq* v. *ABB AG*, 768 F.3d 145 (2d Cir. 2014).  In that case, the Court considered whether the Republic of Iraq could maintain claims stemming from corrupt acts perpetrated by the Saddam Hussein regime in connection with an international aid program administered by the United Nations.  *Id.* at 163-64.  On those unique facts, the Second Circuit grappled with the *in pari delicto*

24

doctrine — that is, whether the Republic of Iraq could also be said to have participated in the alleged wrongdoing.  *Id.* at 160-61.  The Court began with the well-accepted principle that "not every action that happens to be taken by officials of a foreign state is properly attributable to that state." *Id.* at 165. Under the act-of-state doctrine, courts distinguish between public acts taken by individual government actors that are attributable to the state and protected, and private acts that are not attributable to the state and not protected.  *Id.* (citing, *inter alia*, *Republic of the Philippines* v. *Marcos*, 806 F.2d 344, 359 (2d Cir. 1986)).  Because the claims in *Iraq* concerned government-wide conduct with expressly public goals, the Second Circuit determined that the Hussein regime's actions were attributable to the Republic.  *Id.*

The Second Circuit entertained, but ultimately rejected, the Republic of Iraq's appeal to principles of agency law to escape this conclusion.  But in so doing, the Circuit noted that "[g]eneral principles of agency law … are relevant to the question of whether the conduct of an official should be attributed to the state he represents."  768 F.3d at 165.[6]  Thus, courts within this Circuit have considered application of agency principles in the context of a foreign sovereign in determining whether to impute the actions of a government official to the sovereign — here, the judgment debtor.  In *Themis Capital, LLC*, v. *Democratic Republic of Congo*, 881 F. Supp. 2d 508 (S.D.N.Y. 2012), the district court

---

[6]     To the extent that Petitioner relies on opinions and orders from *NML Capital, Ltd.* v. *Republic of Argentina* cases in the Ninth Circuit (*see* Pet. Supp. Br. 1) to argue that it is appropriate to trace embezzled sovereign funds as a means of enforcing judgments against sovereigns, the Court does not disagree.  Nonetheless, nothing in those orders pertaining to discovery goes to the legal points at issue in the instant briefing.

applied agency law in analyzing whether two Congolese officials — the interim
Minister of Finance and Budget and the Governor of the Central Bank —
bound the Republic to a credit agreement.  The action was one to establish the
Republic's liability for failure to pay any outstanding principal or corresponding
interest under the agreement.  *Id.* at 513.  There, agency principles — both
actual and apparent authority — were in play, as liability would not lie against
the Republic of the Congo unless there were a finding that its agents had
entered into a binding agreement on its behalf.  *See id.* at 520-31.

Likewise, in *First Fidelity Bank, N.A.* v. *Government of Antigua &
Barbuda-Permanent Mission*, 877 F.2d 189 (2d Cir. 1989), the Second Circuit
considered whether the Antiguan government was bound by a loan agreement
and subsequent settlement signed on its behalf by its ambassador to the
United Nations.  Antigua argued that because the ambassador exceeded his
actual authority in signing the loan agreement and settlement, Antigua was not
bound by the agreements and retained sovereign immunity under the FSIA.  *Id.*
at 191-92.  Although demurring on the ultimate issues of liability and waiver of
sovereign immunity, the Second Circuit confirmed that agency law was
determinative:

> [I]t may be that Antigua is the innocent victim of its
> ambassador's fraud and the bank's willful ignorance of
> the ambassador's lack of authority.  If so, Antigua
> would retain its sovereign immunity, and the default
> judgment against it would be void for want of subject
> matter jurisdiction.  On the other hand, Antigua may
> simply be trying to renege on a loan by disowning its
> agent who borrowed the money. In that case, the
> FSIA's  commercial  activity  exception  would  strip

> Antigua of its sovereign immunity, and the district court would have subject matter jurisdiction. The default judgment would be valid, and the consent order would be enforceable.

*Id.* at 195-96.

The question here is whether Petitioner has alleged facts supporting a conclusion that the President (or any member of his family) was acting as an agent of the Republic when they allegedly fraudulently transferred the funds. If so, Petitioner has alleged a case that falls squarely within this Court's ancillary jurisdiction as defined by *Epperson*; if not, the Republic may itself be the "innocent victim" of the alleged fraud, *First Fidelity Bank*, 877 F.2d at 195, and resolving this matter would not be a "simple collection mechanism," *Epperson*, 242 F.3d at 107. As discussed above, the purpose of ancillary jurisdiction in cases like this is to empower a court to "enforce its own judgment when a defendant fraudulently conveys assets to avoid that judgment." *Id.* at 107 n.10. If the judgment debtor — here, the Republic — did no such thing, and in fact had the very funds at issue embezzled from it, the purposes underlying ancillary jurisdiction and its availability to smoke out fraudulent conveyances would not be served.

With this legal framework in mind, the Court concludes that Petitioner has not asserted any non-conclusory allegations suggesting that the President was acting as an agent of the Republic when he allegedly misappropriated the funds at issue. Applying basic principles of agency law, Petitioner has not alleged that the President was acting within the scope of his employment, or

that he acted with actual or apparent authority to bind the Congo when making the transfers. Embezzling funds for private use is undoubtedly a "private" act — a "useful [determination of] whether a foreign official's conduct is attributable to his government or sovereign state[.]" *Republic of Iraq*, 768 F.3d at 165.[7] The AP has not provided sufficient facts, or has provided too many contradictory facts, to permit the Court to conclude that the President was acting as an agent of the Republic — and, by extension, that his embezzlement of the funds that were subsequently fraudulently conveyed was an act done by the Republic.[8]

To the extent that Plaintiff offers new, unpleaded theories in its supplemental brief, the efforts are unavailing. Petitioner appears to realize that it cannot map the AP's allegations of embezzlement, personal profit, and the

---

[7]     The Republic argues that even if some theory of attribution were apparent premised on agency principles, the adverse interest exception would apply. (ROC Supp. Br. 11-12). Under that doctrine, "acts of the agent will not be charged to the [principal] if although the agent purportedly acts for the [principal], he is really committing a fraud for his own benefit[.]" *Republic of Iraq* v. *ABB AG*, 768 F.3d 145, 166 (2d Cir. 2014) (internal quotation marks and citation omitted). As Petitioner describes it, the relevant actions constituted a "scheme to launder money embezzled from the Republic for the benefit of the President's children." (AP ¶ 28 (internal quotation marks omitted)). That is, by definition, a fraud committed for the President's own benefit and a textbook example of the adverse interest exception. Still, in a fraudulent conveyance case, the Court is not convinced that the adverse interest exception is germane, given that secreting assets could be construed as always adverse to an entity. For this reason, the Court principally relies on the fact that Petitioner has not pleaded facts warranting a finding that any actions may be attributed to the Republic.

[8]     This case is thus distinguishable from cases where a petitioner adequately alleges that the debtor-corporation (analogous to the sovereign) itself fraudulently conveyed funds. *See, e.g.*, *UFCW Loc. 174 Com. Health Care Fund* v. *Homestead Meadows Foods Corp.*, 425 F. Supp. 2d 392, 393 (S.D.N.Y. 2005) (finding that court had ancillary jurisdiction over claim alleging that "company's assets were transferred to [third-party entity]," where "[t]he plaintiffs claim the transfer was fraudulent and for the purpose of protecting [debtor's] assets from the judgment against it"); *see also Trustees of 1199/SEIU Greater New York Ben. Fund* v. *Sieger*, No. 07 Civ. 9744 (DLC), 2010 WL 3911474, at *4 (S.D.N.Y. Oct. 5, 2010) (finding ancillary jurisdiction when the corporation itself was alleged to have fraudulently conveyed funds).

like onto the *Republic of Iraq* framework, and instead cites only to the *Global Witness* Article.  (Pet. Supp. Br. 3).  Significantly, however, to the extent the *Global Witness* Article suggests more endemic conduct that directly implicates the Republic as a judgment debtor, it conflicts with the AP's plain allegations of outright private thievery.  (*See, e.g.*, AP ¶ 29 ("What is now before the Court is simply the New York branch of the scheme, by which [Ms. Sassou-Nguesso] got herself a $7.1 million luxury condominium investment on Central Park West — using money embezzled from the Republic, belonging to the Republic, and against which the Judgments can therefore be enforced.")).

Petitioner also proffers an entirely new, unpleaded alter ego theory — essentially alleging that any act done by the President or Ms. Sassou-Nguesso is attributable to the Republic because the two are alter egos of the sovereign. (*See* Pet. Supp. Br. 4).  But that doctrine appears wholly inapplicable to the facts at hand.  Alter ego liability in the FSIA context renders a sovereign liable (or allows for execution of judgments against a sovereign) for an alter ego's acts by dint of the *sovereign's* extensive control and relationship to the alter ego, not the inverse.  *See, e.g.*, *First Nat'l City Bank* v. *Banco Para El Comercio Exterior de Cuba ("Bancec")*, 462 U.S. 611, 623-633 (1983) (articulating factors for considering whether separate credit institution created by Cuba could be deemed alter ego of Cuba and its separate corporate identity thus disregarded); *Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, 932 F.3d 126, 139-149 (3d Cir. 2019) (applying the *Bancec* factors to attach assets of Venezuelan-owned oil company in satisfaction of judgments against Venezuela because "so

long as [the company] is Venezuela's alter ego under *Bancec*, the [d]istrict [c]ourt had the power to issue a writ of attachment on that entity's non-immune assets to satisfy the judgment against the country")[9]; *Funnekotter* v. *Agric. Dev. Bank of Zimbabwe*, No. 13 Civ. 1917 (CM), 2015 WL 9302560, at *5 (S.D.N.Y. Dec. 17, 2015) (same, with respect to assets of entities that were alter egos of Zimbabwe); *In re 650 Fifth Ave. & Related Properties*, 881 F. Supp. 2d 533, 551 (S.D.N.Y. 2012) (same, with respect to assets of entities extensively controlled by Republic of Iran); *see also Esso Expl. & Prod. Nigeria Ltd.* v. *Nigerian Nat'l Petrol. Corp.*, 40 F.4th 56, 69 (2d Cir. 2022) (affirming district court's determination that Nigerian oil company was alter ego of Nigeria due to Nigeria's "extensive control" over company); *id.* (noting that "[a]n alter ego relationship is not easy to establish, as duly created instrumentalities of a foreign state are to be accorded a presumption of independent status" (internal quotation marks and citation omitted)).

---

[9]     To be sure, *Crystallex* found that a district court's ancillary jurisdiction extended to alter ego claims in the FSIA context, and noted the interplay of the FSIA and *Peacock*. *See Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, 932 F.3d 126, 139 (3d Cir. 2019) ("[T]he [*First National City Bank* v. *Banco Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611 (1983)] doctrine — the applicability of which is the core question here — is a federal common-law outgrowth of [the FSIA]. It (the doctrine) exists specifically to enable federal courts, in certain circumstances, to disregard the corporate separateness of foreign sovereigns to avoid the unfair results from a rote application of the immunity provisions provided by the Sovereign Immunities Act. Nothing in *Peacock* leads us to believe the Supreme Court expected or intended its decision in that case to restrain the application of *Bancec* in post-judgment proceedings."). Thus, despite being a post-judgment proceeding against the Bolivarian Republic of Venezuela, the Third Circuit found that the judgment holder could press an alter ego theory against Venezuela's state-owned oil company. *Id.*; *see also Crystallex Int'l Corp.* v. *Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 394 (D. Del. 2018) (extensively examining ancillary jurisdiction and discussing different "contexts" of alter-ego liability). Petitioner has not argued for the rule of *Crystallex* — that *Peacock*'s limits on ancillary jurisdiction do not necessarily square with the FSIA — to find that Ecree is the alter ego of the Republic or the like. Indeed, Petitioner has expressly disclaimed such a theory.

Petitioner has not cited to any alter ego cases in which a foreign government official was deemed to be an alter ego of the foreign state by way of that *official's* control over the state.  Instead, Petitioner seeks to turn the alter ego doctrine on its head, to effectively argue that the President and his family members are in fact the state.  (*See, e.g.*, Pet. Supp. Br. 4 n.2 (arguing that *First Fidelity* is distinguishable because the instant case concerns "a despotic, kleptocratic ruler … who exercises complete control over a sovereign")).  Petitioner offers no legal authority for this proposition — nor could it — because this is not how the alter ego doctrine functions in the FSIA context.  Further, Petitioner explicitly disclaimed reliance on alter ego theories in its opposition, in the context of issues associated with Ecree.  (Pet. Opp. 11-12).

At the end of the day, the Court is left with a confusing and apparently shifting theory of attribution of the alleged conduct to the Republic.  Petitioner began by mischaracterizing the import of the *Republic of Iraq* decision.  (Pet. Br. 10-11).  Then Petitioner shifted its argument away from the actual allegations in the AP, and toward exhibits that often contradicted the plain language of the AP.  (Pet. Supp. Br. 2-3).  Finally, Petitioner moved to an alter ego theory of attribution, which theory is nowhere in the AP and has in fact been disclaimed by Petitioner.  (*Id.* at 4).  For all of these reasons, the Court cannot find that Petitioner has adequately alleged that the relevant conduct is attributable to the Republic.[10]

---

[10]    Even if the Court were not to analyze this issue as a jurisdictional matter, it would find that Petitioner has failed to allege a fraudulent conveyance under Rule 12(b)(6) for the same reasons.  (*See, e.g.*, ROC Br. 24-25; Pet. Opp. 23 (arguing that the AP "alleges that

**C.    As Pleaded in the AP, the Condo Is Immune from Execution Under the FSIA**

### 1.    Applicable Law

The AP suffers from a second, and in some ways more basic, issue: it does not sufficiently allege that the Condo is immune from execution under the FSIA.  "[T]wo types of foreign sovereign immunity [are] addressed in the FSIA: [i] 'immunity of a foreign state from jurisdiction,' and [ii] 'immunity from attachment and execution of property of a foreign state.'"  *Walters* v. *Indus. & Com. Bank of China, Ltd.*, 651 F.3d 280, 286 (2d Cir. 2011) (quoting 28 U.S.C. §§ 1604, 1609).  The former immunity is also known as "immunity from suit." *Id.* at 288.  These two immunities "operate independently" from each other, *id.*, and both are subject to their own specific exceptions, *see* 28 U.S.C. §§ 1605, 1610.

With respect to so-called "execution immunity" under the FSIA, "property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter." 28 U.S.C. § 1609; *accord Aurelius Cap. Partners, LP* v. *Republic of Argentina*, 584 F.3d 120, 129-30 (2d Cir. 2009).  As relevant here,

> The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if ... the judgment is based on an order

---

the Republic transferred Republic funds through a specific series of sham transactions ... for the benefit of a newly formed entity, Ecree, fronting for [Ms. Sassou-Nguesso], shortly before the purchase of the Condo")).

> confirming an arbitral award rendered against the
> foreign state, provided that attachment in aid of
> execution, or execution, would not be inconsistent
> with any provision in the arbitral agreement[.]

28 U.S.C. § 1610(a)(6).  (*See* Pet. Opp. 13-14).

## 2. Analysis

Petitioner argues that the Condo is not immune from execution under Section 1610(a)(6).  Putting that section to the side, however, a party seeking to execute on a foreign sovereign's property must still satisfy certain statutory criteria.  Indeed, the Second Circuit has clarified that "the property that is subject to attachment and execution must be 'property in the United States of a foreign state' *and* must have been 'used for a commercial activity' at the time the writ of attachment or execution is issued.  'Even when a foreign state completely waives its immunity from execution, courts in the U.S. may execute only against property that meets these two statutory criteria.'" *Aurelius Cap. Partners*, *LP*, 584 F.3d at 130 (quoting *Conn. Bank of Commerce* v. *Republic of Congo*, 309 F.3d 240, 247 (5th Cir. 2002)).  There is no dispute that the Condo is in the United States; however, the parties disagree as to whether the Republic can be said to be using the Condo for a commercial activity.[11]

As relevant here, several criteria must be met in order to satisfy the "used for a commercial activity" language of the statute.  *First*, Petitioner must show that the holding of the Condo constitutes a commercial activity.  Under

---

[11] Of course, the Court's finding above that Petitioner has not adequately alleged that the Republic fraudulently conveyed funds would also support a finding that the Condo is not property "of a foreign state."  But because the AP pleads that the Condo is in fact the Republic's property, the Court proceeds with its analysis.

the FSIA, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).  As such, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA."  *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 614 (1992).  This is distinguished from "sovereign" use of property, which does not render a foreign sovereign's property attachable under the FSIA.  *See, e.g.*, *Exp.-Imp. Bank of the Republic of China* v. *Grenada*, 768 F.3d 75, 91 (2d Cir. 2014) ("[T]he Restrained Funds ... are devoted to carrying out public functions in Grenada, and used for the maintenance of facilities and services in Grenada....  They therefore do not meet the 'commercial activity' exception to attachment provided by [S]ection 1610(a)." (internal quotation marks and citations omitted)); *NML Cap., Ltd.* v. *Republic of Argentina*, No. 04 Civ. 197 (CKK), 2005 WL 8161968, at *14 (D.D.C. Aug. 3, 2005) ("Maintenance of the property is no longer conducted by Argentina for the benefit of lessees, nor is the property under its immediate control.  Maintenance of a fire lane and pedestrian walkway cannot be deemed a commercial activity under the FSIA since the 'essential character' of the property is for a public function." (internal citations omitted)).

 *Second*, Petitioner must show more than hypothetical commercial use; it must show that there is actual use of the property for a commercial activity. In this regard, in *EM Ltd.* v. *Republic of Argentina*, the Second Circuit found

that Argentina's funds held at the Federal Reserve Bank of New York ("FRBNY") could not be the subject of attachment, because Argentina was not in fact *using* the funds for a commercial activity.  473 F.3d 463, 484 (2d Cir. 2007).  The Second Circuit explained that "[w]e need not define the precise contours of 'used for' within the contemplation of [Section] 1610 because there is no evidence that either actual use or designation for use occurred here with respect to the FRBNY Funds.  The mere fact that the FRBNY Funds *could have* been used to repay the Republic's debts to the IMF ... does not, standing alone, render those funds attachable."  *Id.* (citing *Conn. Bank of Commerce*, 309 F.3d at 254 (noting that the phrase "used for" in Section 1610(a) "means what it says: property of a foreign sovereign ... may be executed against only if it is 'used for a' commercial activity")).  In sum, the "plain language of the statute suggests that the standard is actual, not hypothetical use."  *Id.* (citing *Walker Int'l Holdings Ltd.* v. *Republic of Congo*, 395 F.3d 229, 236 (5th Cir. 2004) (concluding that property was not "used for" reimbursement of legal expenses where agreements never moved beyond negotiation stage)).  Courts across the country have adopted this interpretation of the statutory language, and have found property immune from attachment under the FSIA where there is no actual use of the property.  *See, e.g.*, *Commissions Imp. Exp. S.A.* v. *Republic of the Congo*, No. 16 Civ. 656 (GHK) (SPX), 2016 WL 9281947, at *7 (C.D. Cal. Apr. 21, 2016) (finding that aircraft allegedly owned by Republic of Congo was immune from attachment because "the only relevant evidence before us shows that the aircraft is not being used and is simply being stored

at the Southern California Logistics Airport"); *NML Cap., Ltd.*, 2005 WL
8161968, at *14 ("Due to the uncertainty of Argentina's financial situation and
its past history of attempting to sell the property, [plaintiff] would have a case
for attachment … if the property was still listed for sale or a contract for sale
was in existence.  In this case, there is no evidence to support Argentina's
present intent to sell the property." (internal citation omitted)).

　　　　*Third*, courts across the country have strictly interpreted Section 1610
to require that the foreign sovereign *itself* use the subject property for a
commercial activity.  *See, e.g., Aurelius Cap. Partners, LP*, 584 F.3d at 130
(finding funds held in the United States to be immune from attachment
because "[t]he Republic [of Argentina] had not used the funds for any
commercial activity at the time of attachment[,]" but rather private
corporations holding funds had); *Exp.-Imp. Bank*, 768 F.3d at 90 ("[W]e
understand the word 'used,' read literally, to require not merely that the
property at issue relate to commercial activity in the United States, but that
the sovereign actively *utilize* that property in service of that commercial
activity."); *Ladjevardian* v. *Republic of Argentina*, No. 04 Civ. 2710 (TPG), 2016
WL 3039189, at *5 (S.D.N.Y. May 26, 2016) ("The Republic does not have the
opportunity to use property that is not *in the hands of the Republic*, and the
FSIA therefore precludes execution on any proceeds held by [non-party
financial institution.]" (internal quotation marks and citation omitted)), *aff'd
sub nom. Mohammad Ladjevardian, Laina Corp.* v. *Republic of Argentina*, 663
F. App'x 77 (2d Cir. 2016) (summary order).  Here too, courts across the

country have taken a consistent view of the relevant statutory language.  *See, e.g.*, *HWB Victoria Strategies Portfolio* v. *Republic of Argentina*, No. 17 Civ. 1085 (JTM), 2017 WL 1738065, at *3 (D. Kan. May 4, 2017) ("Here the engines are not being used by the Republic for any commercial purpose.  They are simply being repaired or maintained, and will later be reinstalled on aircraft operated by the Argentine Air Force….  The engines fall within § 1610(a) only if *the Republic* is using them for commercial purposes in the United States." (internal citations omitted)).

Courts have also rejected attempts to impute a third party's use of the relevant property to the sovereign in order to satisfy this statutory criterion. For example, in *Flatow* v. *Islamic Republic of Iran*, the district court found that the United States' leasing of Iranian property — including the former Iranian embassy — did not destroy the properties' immunity from attachment under the FSIA.  76 F. Supp. 2d 16, 23 (D.D.C. 1999).  The district court explained that "if the FSIA could be applied to foreign state property that is being used by a non-agent third party, it would expand the class of cases arising under the Act beyond those limited, enumerated exceptions to immunity prescribed by Congress, and thus would expose foreign states to far greater liability than was originally contemplated under the Act."  *Id.*  Multiple courts have applied this rule in subsequent years, and have routinely found that third-party use of a foreign sovereign's property does not vitiate the property's immunity.  *See, e.g.*, *Rubin* v. *Islamic Republic of Iran*, 456 F. Supp. 2d 228, 234 (D. Mass. 2006) ("Several thorough and well-reasoned cases discuss additional factors

which support the conclusion that the commercial use exception pertains only to the actions of the foreign sovereign." (collecting cases)), *on reconsideration in part sub nom. Rubin* v. *Islamic Republic of Iran*, 541 F. Supp. 2d 416 (D. Mass. 2008).

The *Rubin* v. *Islamic Republic of Iran* case from the Seventh Circuit is instructive here. In that case, the district court found that certain collections of Iranian antiquities within the possession of the University of Chicago were immune from attachment under the FSIA. 33 F. Supp. 3d 1003, 1011 (N.D. Ill. 2014), *aff'd*, 830 F.3d 470 (7th Cir. 2016), *aff'd*, 138 S. Ct. 816 (2018). The district court first held, in line with the above analyses, that "[a] plain reading of [the FSIA] demonstrates that it is the sovereign's commercial activities that subject the property to attachment." *Rubin*, 33 F. Supp. 3d at 1009 (collecting cases). It then considered whether this requirement was satisfied by the university's use of the property. *Id.* at 1010. The plaintiffs in the case argued that "a foreign state cannot conduct commercial activities on its own and must act through agents." *Id.* The court agreed with that generic statement; however, it found, applying agency law, that the university could not be considered to have had a principal-agent relationship with Iran based on the plaintiffs' allegations. *Id.* at 1010-11 ("This relationship is not the equivalent of an agency relationship because Iran (the alleged principal) cannot control the activities of the Institute (the alleged agent) other than to obtain possession of the [c]ollection when the [university], in its judgment, is finished with its studies."); *see also id.* at 1011 ("It should also be noted that

38

the [university] is conducting this academic study for its own research purposes, and not for Iran's benefit…. There is no indication in the record that the Institute ever claimed more than a present possessory interest in the collection, or manifested anything other than an intention to work in its own interest."). Accordingly, the district court found that the assets were not subject to attachment, as there was "no evidence that the [university could] properly be considered an agent of Iran" such that its use of the artifacts would constitute Iran's use. *Id.* at 1012. The Seventh Circuit, in a detailed opinion cataloguing interpretations of Section 1610 from several courts, including the Second Circuit, affirmed the district court's conclusion. *Rubin*, 830 F.3d at 481 ("[Section] 1610(a) applies only when *the foreign state itself* has used its property for a commercial activity in the United States; the actions of third parties are irrelevant.").

In the instant case, the Republic argues that, even assuming the Condo is in fact its property, the Condo is nonetheless immune from execution under Section 1610. (ROC Br. 17-18). The Republic's argument is two-pronged: *First*, the Republic contends, citing the law discussed above, that the AP's core allegation regarding the use of the Condo — that it "was purchased for the use of and as a United States real estate investment for [Ms. Sassou-Nguesso]" (*id.* at 17 (quoting AP ¶ 22)) — is insufficient to show that the Republic *itself* used the Condo. *Second*, the Republic argues that the AP does not sufficiently allege that any use was a "commercial activity," as distinguished from a personal residence or a passive real estate investment. (ROC Reply 8).

Petitioner retorts that the AP alleges that the Condo is used for a commercial activity, insofar as it avers that "[t]he Condominium is … an investment in luxury real estate in Manhattan of a sort any private citizen might make[.]" (AP ¶ 27; Pet. Opp. 14-15).  As to the argument that the Condo is not used by the Republic, Petitioner again contends that "the acts of the President and his ruling family are attributable to the Republic."  (Pet. Opp. 14-15 (citing *Republic of Iraq*, 920 F. Supp. 2d at 524)).

Turning first to the parties' disagreement regarding whether the alleged use of the Condo as a real estate investment constitutes a commercial activity, the Court agrees with Petitioner.[12]  Although the Court understands the Republic's argument that Second Circuit precedent requires that the sovereign "actively utilize" the subject property for a commercial activity (ROC Reply 8 (quoting *Grenada*, 768 F.3d at 90)), the Court sees no reason why a real estate investment could not so qualify.  A real estate holding for investment purposes still qualifies as "active" use, in the same manner that an investment in securities would.  *See, e.g.*, *EM Ltd.* v. *Republic of Argentina*, 389 F. App'x 38, 44 (2d Cir. 2010) (summary order) ("The corpus of the [trust] was therefore an investment of the Republic and the Public Funds' assets were … being used to facilitate the investment and eventual sale of the securities.  An investment of this sort is the kind of activity that a private player in the market would carry on for profit and is, therefore, a 'commercial activity' under the FSIA.").

---

[12]     If the AP had merely pleaded that Ms. Sassou-Nguesso's residence in the Condo was a "commercial activity," the Court would likely have found otherwise.

True, such a theory could easily lend itself to abuse as an end-run around property the FSIA is meant to protect.  For example, real property that is used in uniquely sovereign manners, like embassies or properties used to house diplomatic staff, are not used for a "commercial activity" for purposes of the FSIA.  *See, e.g.*, *City of Englewood* v. *Socialist People's Libyan Arab Jamahiriya*, 773 F.2d 31, 37 (3d Cir. 1985) ("The only purpose Libya has in holding the property, so far as this record discloses, is for use by the Chief of its Mission to the United Nations.  That is activity directly related to the purposes of the mission, and as a matter of law such use is not commercial activity.").  Thus, to the extent there were facts that the Condo were used for such purpose here, the Court would be required to carefully scrutinize Petitioner's allegations.  Because neither side has alleged that that is the case here, the Court credits Petitioner's factual allegation that the Condo is used as a real estate investment, satisfying the "commercial activity" language of the statute.

 But Petitioner once again runs into problems as it relates to *the Republic*'s use of the Condo.  As with the attribution arguments raised by the Republic, Petitioner gives this argument short shrift, merely re-hashing the argument that the "ruling family's" actions are automatically attributable to the Republic.[13]  Thus, Petitioner appears to concede that, based on the theory

---

[13]   The Court also notes that Petitioner appears to suggest that Ecree's declaration that it "was founded May 2014 in New York, NY for the purpose of owning real estate in New York" elucidates that the Republic's alleged ownership of the Condo is a "commercial activity."  (See Pet. Opp. 15 (quoting Dkt. #57)).  However, and as noted previously, Petitioner has expressly disavowed any argument that Ecree is the alter ego of the Republic.  (*See Id.* at 12).  Thus, the Court does not find that it should attribute such

championed in the AP, the Court must find that the allegations that Ms. Sassou-Nguesso uses the Condo as an investment mean that the Republic itself uses the Condo as an investment.  (*See* AP ¶¶ 25 ("The Condominium was purchased with funds of the Republic for the use of and as an investment for [Ms. Sassou-Nguesso]."), 19 ("[T]he Condominium was purchased with funds of the Republic that were illegally and fraudulently transferred from the Republic … for the benefit of Claudia Lemboumba Sassou-Nguesso."), 22 ("[The Condominium was purchased for the use of and as a United States real estate investment for [Ms. Sassou-Nguesso.]")).

The AP does not allege that Ms. Sassou-Nguesso is an agent of the Republic.[14]  Instead, in its opposition, Petitioner merely assumes that her actions (and the actions of all of the President's family members) are automatically attributable to the Republic, including allegations pertaining to her private ownership and use of a luxury condominium.  But for many of the same reasons it found deficiencies in the AP's core fraudulent conveyance theory, the Court concludes that Ms. Sassou-Nguesso's alleged use of the Condo cannot be attributed to the Republic, at least as currently pleaded.  Petitioner alleges that Ms. Sassou-Nguesso uses the Condo and it serves an investment property for her.  (*See, e.g.*, AP ¶ 25).  There is simply no allegation

statements to the Republic as they relate to both "commercial activity" and the Republic's alleged use of the Condo.

[14]  As above, the fact that the *Global Witness* Article describes Ms. Sassou-Nguesso as the "presidential head of communications" (Pet. Opp. 15), does not change this result.  Again, Petitioner does not make the necessary links between and among that title, the use of the Condo, and the Republic under its theory of commercial activity.  Instead, Petitioner simply declares that "the acts of the President and his ruling family are attributable to the Republic." (*Id.*).

that the Court can consider such use as the Republic's use — that is, nothing asserting that such use is any way a "public" act or that any such act was taken as an agent of the Republic.  Indeed, as above, the AP alleges nothing in the way of a principal-agent relationship or analogous method for attributing acts done by the "ruling family" to the judgment debtor.  As with the President's actions, Petitioner pleads no facts that would suggest that Ms. Sassou-Nguesso uses the property on behalf of the Congo, or even represents that she does.  Thus, her use of the Condo appears to be a "private" act and not one that may be "attributable to [her] government."  *Republic of Iraq*, 768 F.3d at 165.[15]  At base, Petitioner has alleged that a third party maintains the Condo for commercial use.  That is plainly insufficient under the FSIA.  *See Rubin*, 830 F.3d at 481; *Aurelius Capital Partners*, 584 F.3d at 131.

## CONCLUSION[16]

Because the Court finds threshold issues that foreclose its ancillary jurisdiction and present execution immunity obstacles under the FSIA, it does not address the remainder of the parties' arguments.[17]  In its supplemental brief, the Republic argues that the Court should not grant Petitioner leave to amend.  (ROC Supp. Br. 6-7).  Yet, as discussed throughout this Opinion, many of the issues identified by Respondents are pleading issues.  The Court cannot say at this time that amendment would be futile, though it expects

---

[15]   The Court will not reiterate its analysis as to Petitioner's newly-advanced alter ego argument, except to note that the connections between the Republic and Ms. Sassou-Nguesso are even more tenuous than those between the President and the Republic.

Petitioner to consider carefully the analysis presented in this Opinion.  *See* Fed. R. Civ. P. 15.

The Court GRANTS Respondents' motions to dismiss the AP.  (Dkt. 105, 107).  But because Respondents have not shown that amendment is futile, the Court grants Petitioner leave to replead and the ability to submit another operative pleading.  Petitioner is ORDERED to file an amended petition by **June 16, 2023.**  Petitioner is on notice that the Court will not grant further amendments should threshold issues be present.  The parties are further ORDERED to submit a joint letter three weeks following submission of the amended petition — *i.e.*, **July 7, 2023** — discussing proposed next steps in this case.

---

16    The Court will not entertain the Republic's eleventh-hour invocation of the political question doctrine.  (ROC Supp. Br. 4-6).  The Court did not request briefing on this issue, and the Republic had an opportunity to raise the issue in reply to Petitioner's opposition.

Nor will the Court consider the parties' arguments pertaining to declining jurisdiction under the Declaratory Judgment Act, given Petitioner's alternative fraudulent conveyance claim.  As a threshold matter, the Court finds that Petitioner's claim under the Declaratory Judgment Act is entirely duplicative of its fraudulent conveyance claim, based on the AP itself and Petitioner's arguments.  (*See, e.g.*, Pet. Opp. 12 ("Nowhere in the Amended Petition is there an allegation that Ecree is an alter ego of the Republic or that its corporate entity should be disregarded.  Rather, the Amended Petition alleges that *through a fraudulent conveyance*, accomplished in several steps, the Republic's funds were used to purchase the Condominium." (emphasis added))).  Declaratory relief is not unheard of in analogous contexts to this case, *see, e.g.*, *Funnekotter* v. *Agric. Dev. Bank of Zimbabwe*, No. 13 Civ. 1917 (CM), 2015 WL 9302560, at *3 (S.D.N.Y. Dec. 17, 2015), but Petitioner has expressly disclaimed the theories that would be relevant for declaratory relief in its papers.

17    The Court agrees with Ecree that to the extent the AP must be dismissed as to the Republic, it must also be dismissed as to Ecree.  (Ecree Br. 17).  Petitioner has not contested this point.

The Clerk of Court is directed to terminate the pending motions at docket entries 105 and 107.

SO ORDERED.

Dated:      May 23, 2023
            New York, New York

_____
            KATHERINE POLK FAILLA
            United States District Judge